**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LONG MIAO, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>FANHUA, INC., CHUNLIN WANG, PENG GE, and QIUPING LAI,<br><br>Defendants. | **Civil Action No.: 1:18-cv-08183-PAE**<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

**Page(s)**

NATURE OF THE ACTION ..... 1

JURISDICTION AND VENUE ..... 5

PARTIES ..... 6

JCAP'S ROBUST AND THOROUGH INVESTIGATION ..... 8

SUBSTANTIVE ALLEGATIONS ..... 9

Background ..... 9

Defendants' Enabled Lai to Use Fanhua as a Personal Piggybank ..... 12

i. Undisclosed Related-Party Disposals to Lai of Guangdong Huajie and P-and-C Businesses ..... 12

ii. Fraudulent Guarantees of Lai's Investment Products ..... 13

iii. The Gargantuan Purchase of Fanhua's ADS from Lai for $246.5 Million ..... 14

Materially False and Misleading Statements and Omissions During the Class Period ..... 16

The Truth Slowly Begins to Emerge ..... 19

POST CLASS PERIOD DEVELOPMENTS ..... 21

Additional Allegations Supporting Scienter ..... 24

PLAINTIFF'S CLASS ACTION ALLEGATIONS ..... 26

COUNT I ..... 29

(Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against Fanhua and the Individual 10(b) Defendants) ..... 29

COUNT II ..... 31

(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants) ..... 31

PRAYER FOR RELIEF ..... 32

DEMAND FOR TRIAL BY JURY ..... 33

Lead Plaintiff Long Miao[1] ("Plaintiff"), individually and on behalf of all other persons and entities similarly situated, by his undersigned attorneys, for his complaint against Defendants (defined below), alleges the following set forth herein. The allegations are based upon (i) personal knowledge as to himself and his own acts and (ii) information and belief as to all other matters, based upon the investigation conducted by and through his attorneys, which included, without limitation, a review of Defendants' public documents, conference calls, and announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Fanhua Inc. ("Fanhua" or the "Company"), analysts' reports and advisories about the Company, information readily obtainable on the Internet, information learned from an investigation by Plaintiff's attorneys, and information learned from an on-the-ground investigation in the People's Republic of China ("China") conducted by J Capital Research USA LLC ("JCap"), a registered investment advisor with the SEC (CRD #290086). Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired Fanhua American depositary shares ("ADS") between April 20, 2018, and January 16, 2019, both dates inclusive ("Class Period"), and were damaged thereby ("Class"), against Defendants to recover damages caused by their violations of the federal securities laws and to pursue remedies under Sections

[1] Mr. Long Miao's surname is Miao. The distinction between the common sequence in the United States of listing an individual's first name and then surname versus the reverse order in China results in some of the names identified herein potentially being inverted inadvertently.

10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

2. Defendant Fanhua (formerly known as CNinsure Inc. ("CNinsure")) is an independent online-to-offline financial-services provider with principal executive offices in China. Through its online platforms and offline sales and service network, Fanhua offers a variety of property and casualty ("P-and-C") and life insurance products and services and insurance-claims-adjusting services.

3. At the heart of this fraud are brazen, undisclosed related-party dealings between Defendants Fanhua and its co-founder and largest shareholder, Qiuping Lai ("Lai"), who used Fanhua as a piggybank to siphon off several hundred millions of U.S. dollars ("$").

4. Lai served as Fanhua's president and an executive director on the Company's board of directors ("Board") between 2004 and 2016. He resigned in March 2016, when Fanhua became embroiled in a rampant corruption scandal with the People's Insurance Company (Group) of China ("PICC"), which then dropped Fanhua as a sales agent. Although resigning, Lai remained a shareholder or executive of 56 current and former Fanhua-related companies, as well as Fanhua's largest principal shareholder. Fanhua admitted in its annual report issued at the outset of the Class Period that Lai "could exert substantial influence over matters requiring approval by our shareholders[.]"

5. The current Fanhua senior executives and Lai have longstanding relationships going back over two decades. In 1999, Defendant Chunlin Wang ("Wang") was working at Lai's predecessor entities to CNinsure, while Defendant Peng Ge ("Ge") headed the Beijing operations of Lai's predecessor entities to CNinsure. Lai currently shares his principal executive office with Fanhua's.

6. The Class Period begins on April 20, 2018, when Fanhua filed its 2017 Form 20-F with the SEC. Fanhua hid related-party transactions with Lai, including transfers to Lai's controlled companies of corporate entities and providing financial guarantees for Lai's companies' investment products.

7. On June 15, 2018, Fanhua filed a Form 6-K with the SEC, announcing a "521 Development Plan" ostensibly designed to provide incentive compensation in the form of 15 million Fanhua ADS shares to its salesperson network. While the Company disclosed that over half of the shares to fund the Plan would be purchased from an unidentified "principal shareholder," it failed to disclose that this was yet another transaction designed to principally benefit Lai (whose 8.5 million Fanhua shares were being purchased at $29 per ADS). The $246.5 million sticker price for this purchase significantly outstripped the $56 million cash and cash equivalents at the end of 2017, as well as a significant portion of the cash generated in the first half of 2018.

8. The truth slowly began to emerge on August 27, 2018, with a report by Seligman Investments that revealed intricate, important details about Fanhua's related-party dealings. In summary, Seligman Investments concluded:

> **[W]e believe that company insiders have quickly resorted to the same self-dealing tactics that they used in 2010/2011**. … We cannot recall a company transferring cash from the company's balance sheet to the founder on this scale and in one transaction.
>
> ***
>
> Simultaneous with the related-party transaction above, **management implemented a complex incentive scheme that we believe will enable further siphoning of cash to related party entities**.
>
> (All emphasis in original)

9. Publication of this report caused a precipitous drop of over 10% in Fanhua's ADS

price.

10. On January 17, 2019, JCap published a report that revealed new crucial details about defendants' scheme. In summary, JCap stated the following:

> **In a major restructuring last year,** Fanhua claimed to have sold its P&C division. Actually, the company simply robbed public shareholders. It gave 11 of the 19 companies targeted for sale to a Fanhua executive and misreported the transfers as a sale to a third party. The remaining companies are either mere shells or were transferred to a company we suspect is related to Fanhua executives.
>
> ***
>
> **Our interviews in China** indicate that Fanhua has guaranteed around ¥1 bln in financial products sold by Lai's privately owned company. We believe these are undisclosed related-party transactions.
>
> ***
>
> Over the course of our months-long investigation of FANH, we concluded that Fanhua Inc. is nothing but a shell game among related parties that allows executives to loot investor cash. We detail how the executives running Fanhua have made undisclosed payments and loans to insiders, used "share incentive plans" to hand themselves cash, and covertly transferred equity in subsidiaries to ensure that investor cash goes into executive pockets.

(All emphasis in original)

11. These revelations caused another dizzying drop of over 12% in Fanhua's ADS price. Prior to the beginning of the revelations of the truth, Fanhua's ADS closed at $25.61 on Friday, August 24, 2018. After these curative disclosures, the share price has plummeted $5.51, or 21.52%, to $20.10 at the close on January 17, 2019, eviscerating significant value, well below the $29 per ADS paid for Lai's shares just a few months before.

12. On February 7, 2019, GeoInvesting—a firm with over a decade-long track record of helping expose billions of dollars in China-based fraud concerning U.S.-listed companies—published a report confirming JCap's findings:

> We think $FANH is shaping up to be one of those cases. Our research indicates that auditors will need to stringently examine this company before signing off on its 2018 audit, simply because we prove that FANH statements made in its JCap rebuttal press release and conference call denying its involvement in certain related party transactions are false.
>
> ***
>
> ***We believe we've caught Fanhua Inc. in an outright lie***.
>
> ***
>
> Others have pointed out that FANH transacts with related parties, something FANH management has denied. We now offer concrete proof through ID documents that they do.
>
> (All emphasis in original)

13. On February 13, 2019, Fanhua filed with the SEC a Form 6-K, announcing that the Board formed an independent special committee to conduct an independent review of the alleged related-party-dealing fraud.

## JURISDICTION AND VENUE

14. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5).

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

16. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Fanhua's ADS are traded on the NASDAQ Stock Market LLC ("NASDAQ"), which is located within this Judicial District. A significant portion of Defendants' actions and the subsequent damages took place in this Judicial District.

17. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the United States mail, interstate telephone communications, and the

facilities of the national securities exchange.

**PARTIES**

18. Plaintiff, as set forth in the certifications previously provided to the Court, acquired Fanhua's ADS at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged curative disclosures.

19. Defendant Fanhua is incorporated in the Cayman Islands, with principal executive offices located at 27/F, Pearl River Tower, No. 15 West Zhujiang Road, Guangzhou, Guangdong 510623, People's Republic of China. Fanhua's ADS are listed on NASDAQ under the symbol "FANH." Each ADS represents 20 ordinary shares that are not for trading but only in connection with the listing on the NASDAQ Global Select Market of American depositary shares.

20. Defendant Wang has been serving as Fanhua's chief executive officer ("CEO") since 2011, Board chairman since 2017, and a director on the Board since 2016. He signed SEC filings during the Class Period that are alleged to have included material misstatements and omissions.

21. Defendant Ge has been serving as Fanhua's chief financial officer ("CFO") since 2008 and a director on the Board since 2016. He signed SEC filings during the Class Period that are alleged to have included material misstatements and omissions.

22. Defendant Lai is Fanhua's co-founder. Lai's principal executive office is 27/F, Pearl River Tower, No. 15 West Zhujiang Road, Guangzhou, Guangdong 510623, People's Republic of China. This is the same office as Fanhua's principal executive offices. Between 2004 through 2016, Lai has served as Fanhua's (and its predecessor, CNinsure's) president and an executive director on the Board.

23. On March 29, 2016, Fanhua announced Lai's resignation as the Company's president and executive director. During this period amidst Lai's resignation, Fanhua was

embroiled in a scandal with the PICC, a state-owned company in China that was the largest issuer of casualty insurance, which around this time had Fanhua as a sales agent partner and represented approximately 27% of Fanhua's revenue. PICC's former president of its P-and-C division, Wang Yingcheng, was arrested and ultimately sentenced to 11 years in jail on corruption charges. Within weeks of Wang Yingcheng's arrest for corruption, PICC unilaterally dropped Fanhua as a sales agent and ceased all business with the Company. Fanhua still employed a family member (apparently a brother) of PICC's Wang Yingcheng. An official of the Chinese Insurance Regulatory Commission ("CIRC") and other regulators stated that Fanhua's relationship with Wang Yingcheng—in part through his family member being a high-level executive at Fanhua—was corrupt and improper.

24. Lai is still a shareholder or executive of 56 current and former Fanhua-related companies. According to Fanhua's Form 20-F for the fiscal year ended December 31, 2017, which the Company filed with the SEC on April 20, 2018 ("2017 20-F"), and Defendants Wang and Ge signed, Lai beneficially owned 206,361,240 Fanhua ordinary shares, which equated to 15.9% of the Company's share capitalization at that time. ***Also***, he owned Master Trend Limited ("Master Trend"), which beneficially owned 200,961,240 Fanhua ordinary shares, which equated to 15.5% of the Company's share capitalization at that time. These shares were the subject of the $246.5-million buyout that took place during the Class Period. Master Trend has its citizenship in the Hong Kong Special Administrative Region of the People's Republic of China. Master Trend's address is Room 2907A, 29/F, Pearl River Tower, No. 15 West Zhujiang Road Guangzhou, Guangdong 510623, People's Republic of China. This is in the same building as Fanhua's principal executive offices.

25. In the 2017 20-F, Fanhua recognized that as a principal shareholder of the

Company, Lai "could exert substantial influence over matters requiring approval by our shareholders, including electing directors and approving mergers or other business combination transactions, and … may not act in the best interests of other noncontrolling shareholders. This concentration of our share ownership also may discourage, delay or prevent a change in control of our company, which could deprive our shareholders of an opportunity to receive a premium for their shares as part of a sale of our company and might reduce the price of our ADS. These actions may be taken even if they are opposed by our other shareholders."

26. Lai owns Shenzhen CC Investment Co. Ltd. ("Shenzhen CC") and Chengchuang (Shenzhen) Investment Co. Ltd. ("Chengchuang Shenzhen"), which are two funds based in Shenzhen, China.

27. Defendants Wang and Ge are sometimes referred to herein as the "Individual 10(b) Defendants."

28. Defendants Wang, Ge, and Lai are sometimes referred to herein as the "Individual Defendants."

29. Defendants Fanhua, Wang, Ge, and Lai are referred to herein as "Defendants."

30. Fanhua is liable for the Individual Defendants and its employees and agents' acts under the doctrine of *respondeat superior* and common-law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

31. The Individual Defendants and Fanhua's other employees and agents' scienter is similarly imputed to Fanhua under *respondeat superior* and agency principles.

**JCAP'S ROBUST AND THOROUGH INVESTIGATION**

32. Many allegations herein are based upon an investigation of Fanhua conducted by JCap on-the-ground in China.

33. JCap is a registered investment advisor with the SEC (CRD #290086). Its team

includes, without limitation, a compliance officer, authors of reports, and investigators. Collectively, JCap's professionals have several years of experience working for reputable investigative firms. JCap's professionals have engaged in compliance training, including, without limitation, reviewing compliance documents in both Chinese and English. Their team includes professionals who are fluent in Chinese and English.

34. JCap's team interviewed approximately 50 different Fanhua current and former employees, including, without limitation, financial comptrollers of Fanhua's operating entities, members of Lai's funds, members of companies to which Fanhua purportedly sold business entities, and several regulators at China's provincial-level insurance agencies. Before interviews, JCap professionals provided questionnaires to interviewees that conveyed policies for the interviews. In order to protect the interviewees, JCap kept confidential their identities and contact information. JCap retained a law firm to acquire information about Fanhua filed with regulators in China.

## SUBSTANTIVE ALLEGATIONS

### Background

35. Fanhua's founders are Lai and Yinan Hu ("Hu").

36. In 1998, Lai and Hu formed Guangzhou Nanyun Car Rental Services Co., Ltd. and Guangdong Nanfeng Automobile Association Co., Ltd. to provide automobile-related services, and in 1999, the entities began distributing automobile-insurance products and services. Over approximately the next decade, through restructurings, acquisitions, and dispositions, the entities evolved their insurance products and services. In 2007, Lai and Hu incorporated CNinsure in the Cayman Islands, made an initial public offering, and listed CNinsure's ADS on NASDAQ under the symbol "CISG."

37. As early as 1998, Defendant Wang was working with Lai at the predecessor entities to CNinsure. In essence, most of Defendant Wang's career has been spent working for or with Lai.

38. As early as 1999, Defendant Ge headed the Beijing operations of the predecessor entities to CNinsure. In essence, most of Defendant Ge's career has been spent working for or with Lai.

39. In 2011, CNinsure acquired 100% equity interests in two insurance agencies, Guangdong Huajie and Dongguan Zhongxin Insurance Agency Co., Ltd ("Dongguan Zhongxin"), from Chengdu Jingshi Investment Co., Ltd. The purchase price was approximately 25 million China Yuan Renminbi ("RMB")[2] ($8 million) for each. A disturbing feature of these acquisitions was that Guangdong Huajie had recent annual revenue of only approximately RMB 1.5 million and operating ***loss*** of RMB 750,000. But CNinsure paid an indicated purchase price of approximately 17 times revenue for the company with an operating loss. A remarkably complex array of entities four layers deep in Chinese filings with the then-existing China State Administration for Industry and Commerce reflected that Lai was in fact the 100% owner of Guangdong Huajie —he was the same 100% owner standing at the end of each entity chain. At that time, Lai was also CNinsure's president and executive director on the Board. The Guangdong Huajie acquisition was thus a related-party transaction, but CNinsure never disclosed it as such.

40. In November 2014, CNinsure announced an issuance to employees of up to 100,000,000 ordinary shares as incentive awards. In December 2014, the Company increased this plan to 150,000,000 ordinary shares. The purchase price for the 100,000,000 ordinary shares was $0.27 per ordinary share or $5.40 per ADS; the purchase price for the additional 50,000,000

---

[2] All figures herein are approximations.

ordinary shares was $0.29 per ordinary share or $5.80 per ADS. The Company announced in December 2014 that it ultimately issued and sold 150,000,000 ordinary shares, equivalent to 7,500,000 ADS, to its employees for an aggregate purchase price of over $40 million. However, the employees' purchases were funded by "loans" that the Company granted. Although the Company in 2014 indicated that the loans would be repaid within two years of issuance, Fanhua's 2017 Form 20-F indicated that repayment has been extended.

41. Around December 6, 2016, CNinsure's shareholders approved the change of the name CNinsure Inc. to Fanhua Inc.

42. Fanhua purports to be a leading independent online-to-offline financial services provider in China. The Company primarily acts as agents for insurance companies in distributing their products to retail and institutional customers. Through Fanhua's online platforms and offline sales and service network, the Company offers a wide variety of financial products and services underwritten by over 79 insurance companies to individuals and businesses, including P-and-C and life insurance products and services. Fanhua also provides insurance-claims adjusting services, such as damage assessments, surveys, authentications, and loss estimations, and value-added services, such as emergency vehicle roadside assistance. Fanhua's distribution and service network covers 31 provinces in China and consists of approximately 754 sales and service outlets, 579,000 sales agents, and 1,200 claims adjustors.

43. For the fiscal year ended 2017, Fanhua generated total net revenues of approximately RMB 4.09 billion ($628 million) and net income of RMB 452 million ($69 million). In 2017, the Company generated net cash from (i) operating activities of RMB 152 million ($23 million) and (ii) financing activities of RMB 48 million ($7 million) and (iii) used net cash in investing activities of RMB 24 million ($4 million) (a negative amount), in total generating a net

increase in cash, cash equivalents, and restricted cash of RMB 176 million ($27 million). As of December 31, 2017, the company had cash and cash equivalents of RMB 364 million ($56 million).

**<u>Defendants' Enabled Lai to Use Fanhua as a Personal Piggybank</u>**

44. During the Class Period, Defendants engaged in a brazen, undisclosed scheme whereby Lai used Fanhua's cash and assets for his personal benefit, including (i) dispositions to Lai of corporate entities, (ii) financial guarantees for investment products that Lai issued, and (iii) a gargantuan ADS repurchase from Lai misleadingly dressed up as part of an incentive plan.

**i. Undisclosed Related-Party Disposals to Lai of Guangdong Huajie and P-and-C Businesses**

45. In 2016, Fanhua divested Guangdong Huajie and Dongguan Zhongxin for a total cash consideration for both of only RMB 30,712, *i.e,* at a loss of nearly the entire purchase price of RMB 25,000,000. These transactions were disclosed in the 2017 20-F. Fanhua failed to disclose at the time that Lai was the recipient of these assets at the bargain basement prices.

46. In October 2017, Fanhua disposed of the equity interests in Fanhua Times Sales & Service Co., Ltd. ("Fanhua Times"), 17 other P-and-C insurance agencies, and 1 insurance brokerage firm for a total consideration of approximately RMB 225.4 million ($34.6 million) to the entity Beijing Cheche Technology Co., Ltd. ("Cheche"). Cheche was to pay approximately over one-third of the purchase price in cash and the rest with a convertible loan receivable, which is convertible or collectible in three years and carries a 10% annual interest return.

47. Fanhua announced in the 2017 20-F (filed April 20, 2018) that Cheche was an arm's-length, "third party" buyer, even though it is in fact owned or controlled by Lai, as demonstrated by the following: Shenzhen Ruiyuan Investment Company (Limited Partnership), which is an owner of Cheche, was registered at the same address in Shenzhen, China, and at

approximately the same time as several Fanhua subsidiaries and at the same address and time as Lai's investment vehicle Chengchuang Shenzhen. Moreover, several Cheche operating entities in Guangzhou, China, share an office with Fanhua entities and one of Lai's companies.

**ii. Fraudulent Guarantees of Lai's Investment Products**

48. Fanhua categorically stated in the 2017 20-F (filed April 20, 2018) that "[w]e have not entered into any financial guarantees or other commitments to guarantee the payment obligations of third parties[,]"

49. But in fact, personnel interviewed by JCap stated that Fanhua guarantees handsome returns that funds that Lai owns, such as Chengchuang Shenzhen (a fund that manages trusts and private-equity funds), offers in connection with financial products that Lai issues in China to investors.

50. Four separate longtime Fanhua employees stated that the Company guarantees Lai's investment products, including guarantees of both principal and returns of between 6.8% and 8.5% to investors in Chengchuang Shenzhen private-equity funds, among other funds.

51. Information about Fanhua's guarantees was stated to JCap by different interviewees, including one working at Fanhua in a financial role and another working at a fund that Lai owns. Another interviewee who discussed the guarantees with JCap not only worked in sales for Fanhua's companies but also sold products for Lai's entities.

52. Several interviewees stated that Fanhua's sales professionals and agencies also sell Lai's investments products, including those from Chengchuang Shenzhen. Chengchuang Shenzhen staff stated that Fanhua's insurance-sales network sells Lai's investment products. Corroborating this, Fanhua's insurance-sales staff confirmed that they sell these products. They also sell funds designed by another of Lai's entities, Chengdu Chuangjiarui.

53. At least one sales agent that works with Fanhua and Lai's investment products stated that Fanhua's guarantees are in the purchase contracts that Lai's investment clients are able to review after they commit capital to Lai's funds. The sales agents state that they are only permitted to disclose the purchase contracts to the investment funds' paying clients.

54. A manager at Puyi Wealth Management, which Fanhua owns a stake of and whose financial products Fanhua sells, told JCap that Fanhua agreed to make the payment on Lai's trust products if there are defaults.

55. JCap also learned from Fanhua former employees in the Company's finance divisions that Fanhua backed and paid for two defaults by Lai's entities, neither of which was disclosed by the Company.

**iii. The Gargantuan Purchase of Fanhua's ADS from Lai for $246.5 Million**

56. On June 15, 2018, Fanhua filed a Form 6-K with the SEC, which Defendant Wang signed, announcing a 521 Development Plan that entailed making available to employee-participants 15 million shares of the Company's ADS for purchase by employees, predominantly through a "Fanhua Entrepreneurial Fund[.]"

57. Fanhua stated that the "[B]oard is confident this will further strengthen its cash generation capabilities[.] … The 521 Development Plan enables us to mobilize all of our … material and financial resources to focus on the growth of the highly valuable long-term life insurance business, which can bring in strong and steady cash flow to the Company. … We have strong cash position and expect stronger cash generation capabilities as a result of the 521 Development Plan."

58. Fanhua stated that it intended to set up a Fanhua Entrepreneurial Fund ("Fanhua Fund") to purchase approximately 14 million Company ADS. At least 10% of the total

subscription cost of this fund was to be contributed by eligible participants (team leaders, general managers, and key personal), and the remaining portion was to be funded by loans granted to participants by Fanhua, which was to bear interest at 8% per annum. Fanhua's ADS held by the Fanhua Fund was to be pledged to the Company to secure payment of loans by the participants. Also as part of the 521 Development Plan, Wang, Ge, and certain Board members intended to personally purchase 1 million shares of Fanhua's ADS.

59. Fanhua had approximately 65 million shares of ADS outstanding then, so the Company planned to purchase approximately 22% of its ADS float, through a combination of cash outflows and dilution.

60. Fanhua failed to disclose, though, that ***8.5 million shares of Fanhua's ADS (over 50% of the shares intended for the plan) was going to be repurchased from Lai.*** Instead, Fanhua only disclosed that these 8.5 million shares were to be purchased by "a principal shareholder" of which there were several at the time.

61. Fanhua disclosed that that it was going to pay Lai $29.00 per ADS, representing the average closing price of the 30 trading days prior to June 14, 2018, for a total of approximately $246.5 million. This was multiples of the Company's cash balance of approximately $56 million as of the end of 2017, all of which would go to the undisclosed benefit of Lai. This transaction represented 85% of Lai's holdings of Fanhua ADS at the time.

62. Stated otherwise, whereas Fanhua presented this stock acquisition plan as intended to fund an employee incentive program, it was in fact a cover for a buyout of most of Lai's Fanhua shares and funneling of a substantial portion of the Company's cash on hand into his coffer. The fortuitous timing of this transaction, as reflected below, further evidences its undisclosed related party/true purpose. Whereas in the first weeks of the Class Period, Fanhua traded between $25-

$27 per ADS, within the 30-day window for which the price of the transaction was set, the stock skyrocketed over 40% to $36, only to collapse shortly thereafter, sliding down to slightly over $20 per ADS by the close of the Class Period following all adverse revelations.




**<u>Materially False and Misleading Statements and Omissions During the Class Period</u>**

63. The Class Period begins on April 20, 2018, when Fanhua filed with the SEC its annual report on Form 20-F for the fiscal year ended December 31, 2017 ("2017 20-F"), which Defendants Wang and Ge signed and provided certifications under Sections 302 and 906 of the Sarbanes-Oxley Act of 2002. Fanhua stated the following regarding "Off-Balance Sheet Commitments and Arrangements[,]" in relevant part:

> ***We have not entered into any financial guarantees or other commitments to guarantee the payment obligations of third parties.*** … ***Furthermore, we do not have any retained or contingent interest in assets transferred to an unconsolidated entity that serves as credit, liquidity or market risk support to such entity. We do not have any variable interest in any unconsolidated entity that provides financing, liquidity, market risk or credit support to us***[.][3]

[3] All emphasis is added herein, unless stated otherwise.

64. The statements in ¶ 63 were materially false and misleading, as well as having failed to disclose material adverse facts, because in actuality, Defendants engaged in a brazen, undisclosed scheme to enable Lai to use Fanhua as a piggybank for lucrative related-party dealing, including the Company providing financial guarantees for the principal and handsome returns of up to 8.5% offered by investment products that Lai issued, such as those through Chengchuang Shenzhen and Chengdu Chuangjiarui, the outstanding principal balances of which are believed to be at least RMB 1 billion ($147 million).

65. In the 2017 20-F, Fanhua stated the following regarding the Company's share-purchase agreement with Cheche, in relevant part:

> [W]e entered into a share purchase agreement with Cheche, which operates an online auto insurance platform. Under this agreement, we disposed of the equity interests in 19 P&C insurance intermediary subsidiaries, to Cheche for a total consideration of approximately RMB225.4 million (US$34.6 million), including approximately RMB95.4 million cash consideration and RMB130.0 million in the form of a convertible loan receivable, which is convertible or collectible in three years and recognized as other non-current assets.
>
> ***
>
> [T]he Group disposed of the equity interests in Fanhua Times Sales & Service Co., Ltd., and its subsidiaries which primarily conduct P&C insurance business (collectively, the "P&C Insurance Division") ***to a third party, call Beijing Cheche Technology Co., Ltd.*** ("Cheche"), for a consideration including a convertible loan receivable.

66. The statements in ¶ 65 were materially false and misleading, as well as having failed to disclose material adverse facts, because in actuality, Lai had a substantial stake in Cheche, which thus was not an independent third party but rather a related third party controlled by Fanhua's major shareholder.

67. In the 2017 20-F, Fanhua stated the following regarding disposing of Guangdong Huajie, in relevant part:

> During the year ended December 31, 2016, the Group disposed of three subsidiaries, including Shandong Fanhua Mintai Insurance Agency Co., Ltd …, Guangdong Huajie Insurance Agency Co., Ltd … and Dongguan Zhongxin Insurance Agency Co., Ltd …, for a total cash consideration of RMB30,712. …
>
> As of December 31, 2016, the Group has completed the closing procedures of all the above transactions and has effectively transferred its control of Shandong Mintai, Guangdong Huajie and Dongguan Zhongxin to the respective buyers.

68. The statements in ¶ 67 were materially false and misleading, as well as having failed to disclose material adverse facts, because in actuality, these assets were conveyed at bargain basement prices to an entity owned by Lai.

69. On June 15, 2018, Fanhua filed a Form 6-K with the SEC ("6/15/18 6-K"), which Defendant Wang signed. In fleeting fashion, Fanhua referenced the purchase of 8.5 million shares of ADS from "a principal shareholder" (Fanhua had several principal shareholders at that time): "Of the 14 million ADSs available to participants in any Fanhua Fund and the 1 million ADS to be purchased by management and board members, 8.5 million ADSs will be purchased from a principal shareholder at $29.0 per ADS[.]" In the 6/15/18 6-K, Fanhua stated that the "[B]oard is confident this will further strengthen its cash generation capabilities[.] … The 521 Development Plan enables us to mobilize all of our … material and financial resources to focus on the growth of the highly valuable long-term life insurance business, which can bring in strong and steady cash flow to the Company. … We have strong cash position and expect stronger cash generation capabilities as a result of the 521 Development Plan."

70. The statements in ¶ 69 were materially false and misleading, as well as having failed to disclose material adverse facts, because in actuality, (i) the primary beneficiary of the 521 Plan was not the Company, but rather Lai, who was offloading 85% of his Fanhua shares at exceptionally high prices; (ii) while the Company claimed the Plan would enhance future cash flow, it failed to disclose that it would suck out a substantial portion of cash on hand, again for the

sole benefit of Lai; and (iii) given Lai's admitted powerfully influential position with the Company, this was not an independent but rather related party transaction.

**The Truth Slowly Begins to Emerge**

71. On Monday, August 27, 2018, Seeking Alpha published a report by Seligman Investments, an offering brand of Columbia Management Investments Advisers, LLC, entitled "*Fanhua, Inc. (NASDAQ: FANH)[;] A Questionable Company with a History of Alleged Fraud, Potential 79-100% Downside*[.]" The report detailed Fanhua's related-party dealings, such as the gargantuan purchase of the 8.5 million shares of Fanhua's ADS from Lai for approximately $246.5. In summary, the Seligman Investments report stated the following, in relevant part:

- **[W]e believe that company insiders have quickly resorted to the same self-dealing tactics that they used in 2010/2011**. This behavior has become blatant in the last few weeks, and involves the co-founder selling approximately **$250mm** of stock to the company[.] … We cannot recall a company transferring cash from the company's balance sheet to the founder on this scale and in one transaction. …

- Simultaneous with the related-party transaction above, **management implemented a complex incentive scheme that we believe will enable further siphoning of cash to related party entities**. This scheme is almost identical to one that they implemented in the past. We believe that this scheme, **when combined with the $250mm related party transaction just announced with the founder, is likely to drain 91% of the company's current cash balance**. We also document a history of the company making loans to insiders so that they can purchase stock, and then not paying back the loans. …

- Within days of the founder's transaction being announced, **the largest outside holder in the company, Fosun Industrial Holdings Ltd ["Fosun"], registered to sell its entire stake (3.3mm ADS's)**. Given the rapid timing, we suspect this holder was blindsided and is preparing to exit after realizing the magnitude of what just occurred. … . …[4]

- Fanhua is a roll-up that has completed numerous acquisitions, mostly of other insurance intermediaries. **It is our belief, based upon an ongoing review of these transactions, that these acquisitions are rife with related-party abuses similar**

[4] In April 2017, Fosun paid Fanhua approximately $29 million to purchase 66 million of Fanhua's ordinary shares, which then represented approximately 5.34% of the total outstanding float. As of January 30, 2018, Fosun had indeed dumped all of its holdings in Fanhua shares.

> **<u>to what we have observed in various US-listed offshore companies.</u>** We document one case in particular where Fanhua announced an acquisition of a company, yet failed to disclose that it was a related party owned by the founder. Our review of local Chinese filings indicates that the founder of Fanhua still owns the entity years later, suggesting that it was a fictitious transaction. The chart of the "acquired" entity's ownership required tracing multiple layers of intermediate entities, leading us to believe that the structure was designed to make it extremely difficult to establish its true ownership. We believe that this example is merely the tip of the iceberg. …

(All emphasis in original)

72. On this news, Fanhua's ADS price experienced a precipitous drop of approximately $2.69 per share, or approximately 10.5%, to close at $22.92 on August 27, 2018, on exceptional trading volume.

73. On Thursday, January 17, 2019, JCap—a registered investment advisor with the SEC, (CRD #290086)—published a report entitled "*Fanhua (FANH)[;] Who Owns Fanhua? Not the U.S. Shareholders*." The report revealed new crucial details about Fanhua's brazen scheme including, as detailed above, (i) acquisitions from and dispositions to Lai of corporate entities, including, without limitation, Guangdong Huajie and P-and-C insurance entities, and (ii) financial guarantees for investment products that Lai issued, including, without limitation, Chengchuang Shenzhen and Chengdu Chuangjiarui:

> **In a major restructuring last year,** Fanhua claimed to have sold its P&C division. Actually, the company simply robbed public shareholders. It gave 11 of the 19 companies targeted for sale to a Fanhua executive and misreported the transfers as a sale to a third party. The remaining companies are either mere shells or were transferred to a company we suspect is related to Fanhua executives.
>
> ***
>
> **In its life as a public company,** Fanhua has regularly enriched its executives by buying companies from individual managers then divesting them again or simply gifting companies to managers, all without disclosure. In our report, we detail more than a dozen such cases, but there are many more. …

> **A new share compensation scheme,** the 521 Scheme, has been used to justify paying $250 mln to company co-founder Lai Qiuping. We believe the plan is simply a diversion. It closely resembles the scheme that collapsed the company's share price in late 2010. …
>
> **Our interviews in China** indicate that Fanhua has guaranteed around ¥1 bln in financial products sold by Lai's privately owned company. We believe these are undisclosed related-party transactions.
>
> ***
>
> Over the course of our months-long investigation of FANH, we concluded that Fanhua Inc. is nothing but a shell game among related parties that allows executives to loot investor cash. We detail how the executives running Fanhua have made undisclosed payments and loans to insiders, used "share incentive plans" to hand themselves cash, and covertly transferred equity in subsidiaries to ensure that investor cash goes into executive pockets.
>
> (All emphasis in original)

74. On this news, Fanhua's ADS price had a dizzying fall of approximately $2.85 per share, or approximately 12.42%, to close at $20.10 on January 17, 2019, on exceptional trading volume.

75. Overall, prior to the beginning of the revelations of the truth, Fanhua's ADS closed at $25.61 on Friday, August 24, 2018. After the curative disclosures alleged here, the share price has plummeted $5.51, or 21.52%, to $20.10 at the close on January 17, 2019, eviscerating significant value. Plaintiff and other Class members suffered significant losses and damages as a result of Defendants' alleged fraud and this precipitous decline in the market value of Fanhua's ADS price.

## POST CLASS PERIOD DEVELOPMENTS

76. On February 7, 2019, GeoInvesting published a report entitled "*Has Fanhua (FANH) Been Caught in an Outright Lie? We Believe Fanhua Could Fall off the Cliff at Any Time*[.]" In addition to Seligman Investments and JCap's reports, GeoInvesting's report provides factual support for the related-party-dealing fraud alleged here. GeoInvesting is a research firm

that publishes information regarding stocks, options, futures, bonds, derivatives, commodities, currencies, or other securities. The firm has over a decade-long track record of helping expose billions of dollars in China-based fraud concerning U.S.-listed companies.

77. According to GeoInvesting, it is arguable that Fosun dumped Fanhua's ADS because it did not trust the Company's management in connection with the 521 Development Plan.

78. Based on results from conducting a robust and thorough investigation, GeoInvesting issued scathing findings concerning the related-party fraud committed by Defendants, confirming JCap's findings, and even contradicting Fanhua's recent attempts to further prevent the fraud from being exposed. In response to JCap's report and Fanhua's subsequent denial, GeoInvesting stated that "***We believe this denial is an outright lie.***" Other examples follow:

> It has been a few years since we have written a critical piece on a U.S. listed China based company. Since 2010, fourteen U.S. listed China based companies worth billions have been halted or delisted as a result of GeoInvesting's due diligence.
>
> Our expertise lies in extensive on the ground due diligence, and we have become proficient in sniffing out fraud by examining documents in China that U.S. investors and analysts can't find or don't make an effort to find. Even then, these documents can sometimes be hard or confusing to interpret. In almost every instance that we uncovered deceit in U.S. listed China based stocks and we were eventually proven correct, management has issued press releases and held conference calls saying we were wrong. It is just the game many of these companies play, delaying the massive losses investors inevitably suffer. Many of the dog fights we were in, and won, dealt with confusing disclosed and undisclosed related party issues that simple document analysis shed light on.
>
> ***
>
> ***We think $FANH is shaping up to be one of those cases. Our research indicates that auditors will need to stringently examine this company before signing off on its 2018 audit, simply because we prove that FANH statements made in its JCap rebuttal press release and conference call denying its involvement in certain related party transactions are false.***
>
> ***

> ***We believe we've caught Fanhua Inc. in an outright lie***: despite FANH stating on its recent conference call that they have no related party relationship with Liu Tingting and Yang Lin, we have concrete evidence that they do[.]
>
> ***
>
> ***Others have pointed out that FANH transacts with related parties, something FANH management has denied. We now offer concrete proof through ID documents that they do.*** This leaves no ambiguity of the individuals in question, which helps avoid any possible confusion based on matching names.
>
> ***
>
> FANH appears to us to just be a holding company that holds a range of investments that are incredibly difficult to analyze for outside investors. ***Opaque disclosures, coupled with the fact that the company deals with related parties and may not be forthcoming about these facts, causes great worry.***
>
> ***
>
> ***The fact that Yang Lin has a joint venture with FANH and another joint venture with FANH's founder Lai Qiuping, is, in our opinion, enough proof to establish a clear related party relationship between Yang Lin and FANH.***
>
> Did the divestment of the 19 P&C subsidiaries to Cheche involve funneling money/interests? Investors can judge for themselves, but we find it dubious that 12 of these subsidiaries, within a year later, wound up under the control of Yang Lin, a related party to FANH. Both Beijing Baoping (joint venture with Yang Lin) and Beijing Fanhua Small Loan (joint venture with Liu Tingting) are not listed in FANH's annual report as its affiliates (FANH does not claim to ONLY list important subsidiaries, therefore all subsidiaries should be listed).
>
> ***
>
> Even after JCap's report, FANH tried to deny the fact that Liu Tingting and Yang Lin have a related party relationship with the company. We have now provided evidence that FANH established joint ventures with both Liu Tingting and Yang Lin. With this evidence, we can't see how FANH can continue to deny the related party relationship with Liu Tingting and Yang Lin. ***We find it extremely worrisome that a US listed public company would deny, on the record, such an important aspect of its business.***

79. GeoInvesting made several findings about the general lack of trustworthiness of the Defendants and the likely ramifications of further grave fallout as fraud continues to be revealed:

> We contend that FANH stock is completely uninvestable and that the company needs to be placed under deep scrutiny by auditors, analysts, investors and U.S. regulators[.]
>
> ***
>
> We strongly encourage the company's auditor, Deloitte, to take a deep dive into the details surrounding FANH's claimed business as it is disclosed in the company's annual report. Until the company makes very clear to its auditors and, more importantly, investors, how FANH is operating, we believe the company is clearly uninvestable and carries substantial risk of having to restate its financials, **for example due to non-consolidation of its real estate joint venture** that has existed since 2016, but was only disclosed in November of 2018.
>
> ***
>
> FANH also has several other investments, such as Beijing Baoping and Beijing Fanhua Small Loan, which have not been disclosed in its financial statements. We believe the risk of delisting is very real as we don't believe the company has met the requirements put forth by SEC disclosure rules and by standard audits.

80. On February 13, 2019, Fanhua announced that the Board formed an independent special committee to conduct an independent review of the alleged related-party-dealing fraud, including the issues raised in the analysts' reports identified herein.

**Additional Allegations Supporting Scienter**

81. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

82. The alleged related-party-dealing scheme includes several material transactions with Lai, who is Fanhua's co-founder and at times, the Company's largest shareholder. These transactions include the following, without limitation: (i) dispositions to Lai of corporate entities, including, Guangdong Huajie and P-and-C insurance entities; (ii) financial guarantees for investment products that Lai issued, including through Chengchuang Shenzhen and Chengdu Chuangjiarui; and (iii) a gargantuan repurchase of 8.5 million shares of Fanhua's ADS from Lai, for which Lai was paid $29.00 per share and received approximately $246.5 million.

83. The Individual 10(b) Defendants Wang and Ge were aware of or, at the least, recklessly disregarded that these material financial transactions were being executed with Lai. Indeed, the facts alleged herein permit more than a reasonable inference that Wang and Ge negotiated directly with Lai. Moreover, the Individual 10(b) Defendants made statements to investors throughout the Class Period specifically concerning the transactions-at-issue, such as the dispositions of Guangdong Huajie and P-and-C insurance entities and the gargantuan repurchase of Fanhua's ADS. This reflects that they knew about or, at the least, recklessly disregarded information concerning Lai's involvement in those transactions.

84. The memory of a recent alleged fraud concerning a similar CNinsure equity-incentive scheme should be fresh in the minds of the Individual Defendants and other Fanhua executives and directors. On August 13, 2012, in *Van Dongen v. CNinsure Inc., et al.*, No. 11-cv-7320 (VM) (S.D.N.Y.), Lead Plaintiffs Jeff Schram and Linda Schram filed an amended complaint [ECF No. 12] against defendants CNinsure Inc., Hu (the co-founder, former CEO and Board chairman, and a current Fanhua Board member), Defendant Lai (the co-founder and former president and executive director on the Board), and Defendant Ge (the CFO), on behalf of CNinsure's ADS purchasers between March 2, 2010, and November 21, 2011, both dates inclusive, under the Exchange Act. Plaintiffs there alleged that defendants issued material misstatements and omissions in connection with an unlawful equity-incentive-compensation scheme. The Honorable Judge Victor Marrero sustained the claims, denying defendant CNinsure's motion to dismiss. *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 479 (S.D.N.Y. 2013). The parties settled the litigation for $6,625,000, which was granted final approval on August 15, 2014 [ECF No. 56].

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

85. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class, consisting of all those who purchased or otherwise acquired Fanhua's ADS during the Class Period and were damaged upon the revelation of the alleged curative disclosures. Excluded from the Class are Defendants, Fanhua's officers and directors, and at all relevant times, their immediate family members and their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

86. The Class members are so numerous that joinder of all members is impracticable. Throughout the Class Period, Fanhua's ADS were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands, of proposed Class members. Record owners and other Class members may be identified from records maintained by Fanhua or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

87. Plaintiff's claims are typical of the Class members' claims, as all Class members are similarly affected by Defendants' wrongful conduct in violation of federal securities laws that are complained of herein.

88. Plaintiff will fairly and adequately protect the Class members' interests and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

89. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are the following:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of Fanhua;

- whether the Individual Defendants caused Fanhua to issue false and misleading statements during the Class Period;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether Defendants acted knowingly or recklessly in issuing false and misleading statements and omissions;

- whether the prices of Fanhua's ADS during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the Class members have sustained damages and if so, what is the proper measure of damages.

90. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

91. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the misrepresentations and omissions were material;

- Fanhua's ADS are traded in an efficient market;

- Fanhua's ADS met the requirements for listing, were listed, and were liquid and actively traded with moderate-to-heavy volume on NASDAQ, a highly efficient

and automated market, with over approximately 1,040,000 shares traded on average weekly during the Class Period;

- As a public issuer, Fanhua filed periodic public reports with the SEC and NASDAQ;
- Fanhua regularly communicated with public investors through established market-communication mechanisms, including, without limitation, through the regular dissemination of press releases through major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;
- Fanhua was followed by securities analysts who wrote reports that were widely distributed and publicly available;
- unexpected material news about Fanhua was rapidly reflected and incorporated into the Company's ADS price during the Class Period;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of Fanhua's ADS; and
- Plaintiffs and Class members purchased, acquired, and/or sold Fanhua's ADS between the time that Defendants failed to disclose or misrepresented material facts and the time that the true facts began to be revealed, without knowledge of the omitted or misrepresented facts.

92. Based upon the foregoing, the market for Fanhua's ADS promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the shares. Plaintiff and the Class members are entitled to a presumption of reliance upon the integrity of the market.

93. Also, Plaintiff and the Class members are entitled to the presumption of reliance established by the U.S. Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against Fanhua and the Individual 10(b) Defendants)**

94. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

95. This Count is asserted against Fanhua and the Individual 10(b) Defendants and is based upon Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

96. During the Class Period, Fanhua and the Individual 10(b) Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

97. Fanhua and the Individual 10(b) Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

- employed devices, schemes, and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Fanhua's ADS during the Class Period.

98. Fanhua and the Individual 10(b) Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Fanhua were materially false and misleading, knew that such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced

in the issuance or dissemination of such statements or documents as primary violations of the securities laws. The Individual 10(b) Defendants by virtue of their receipt of information reflecting the true facts about Fanhua, their control over, receipt, and/or modification of Fanhua's allegedly materially misleading statements, and/or their associations with the Company that made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

99. Information showing that Fanhua and the Individual 10(b) Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior executives and directors of Fanhua, the Individual 10(b) Defendants had knowledge of the details of Fanhua's internal affairs.

100. The Individual 10(b) Defendants, who are Fanhua's senior officers and directors, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and they intended to deceive Plaintiff and other Class members or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Fanhua personnel to members of the investing public, including Plaintiff and the Class.

101. Each Individual 10(b) Defendant possessed and acted upon unlawful, self-interested motive in perpetrating the alleged fraudulent scheme.

102. As a result of the foregoing, the market price of Fanhua's ADS was artificially inflated during the Class Period. In ignorance of the falsity of Fanhua and the Individual 10(b) Defendants' statements, Plaintiff and other Class members relied on the statements described above and/or the integrity of the market price of Fanhua's ADS during the Class Period in

purchasing the Company's ADS at prices that were artificially inflated as a result of Fanhua and the Individual 10(b) Defendants' statements false and misleading statements.

103. Had Plaintiff and other Class members been aware that the market price of Fanhua's ADS had been artificially and falsely inflated by Fanhua and the Individual 10(b) Defendants' false and misleading statements and by the material adverse information that Fanhua and the Individual 10(b) Defendants did not disclose, they would not have purchased Fanhua's ADS at the artificially inflated prices that they did, or at all.

104. As a result of the wrongful conduct alleged herein, Plaintiff and other Class members have suffered damages in an amount to be established at trial.

105. By reason of the foregoing, Fanhua and the Individual 10(b) Defendants have violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder and are liable to Plaintiff and other Class members for substantial damages that they suffered in connection with their purchase of Fanhua's ADS during the Class Period.

106. This action was brought less than five years after the fraud alleged herein occurred and within two years of when Plaintiff discovered or should have discovered the fraud with reasonable due diligence.

**COUNT II**

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

107. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

108. During the Class Period, the Individual Defendants participated in the operation and management of Fanhua and conducted and participated, directly and indirectly, in the conduct of Fanhua's business affairs. Because of their senior positions as executives and/or directors, they knew the adverse non-public information about Fanhua's misstatements and omissions.

109. As senior officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Fanhua's results of operations and financial condition and to correct promptly any public statements issued by Fanhua that had become materially false or misleading.

110. Because of their positions of control and authority as senior officers and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings that Fanhua disseminated in the marketplace during the Class Period concerning Fanhua's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Fanhua to engage in the wrongful acts complained of herein. The Individual Defendants therefore were "controlling persons" of Fanhua within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged that artificially inflated the market price of Fanhua's ADS.

111. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Fanhua.

112. This action was brought less than five years after the fraud alleged herein occurred and within two years of when Plaintiffs discovered or should have discovered the fraud with reasonable due diligence.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a) declaring this action to be a proper class action and certifying Plaintiff as class representative under Federal Rule of Civil Procedure 23 and designating Plaintiff's counsel as class counsel;

(b) awarding damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, together with interest thereon;

(c) awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including, without limitation, prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

(d) awarding Plaintiff and other Class members such other and further relief as the Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: February 20, 2019

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Marc I. Gross*
Marc I. Gross
Jeremy A. Lieberman
Justin S. Nematzadeh
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: migross@pomlaw.com
jalieberman@pomlaw.com
jnematzadeh@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

*Counsel for Lead Plaintiff*