UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LONG MIAO, *individually and on behalf of all others
similarly situated*,

Plaintiff,

-v-

FANHUA, INC., CHUNLIN WANG, PENG GE,
and QIUPING LAI,

Defendants.

18 Civ. 8183 (PAE)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

In this putative class action arising under the federal securities laws, lead plaintiff Long Miao claims that a Chinese financial services provider's failure to disclose alleged related-party dealings violated federal securities law. In his First Amended Class Action Complaint, Dkt. 27 ("FAC"), Miao claims that Fanhua, Inc. ("Fanhua"), and two of its officers, defendants Chunlin Wang and Peng Ge, made false and misleading statements or omissions regarding Fanhua's alleged undisclosed dealings with defendant Qiuping Lai—a former president and director of Fanhua who remained a principal shareholder of the company during the Class Period.

Miao brings this lawsuit on behalf of all persons (other than defendants) who purchased U.S.-traded securities of Fanhua between April 20, 2018 and January 16, 2019 (the "Class Period"). Miao alleges violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and the corresponding rule of the Securities and Exchange Commission, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").[1]

---

[1] Specifically, Miao brings a claim for violations of § 10(b) and Rule 10b-5 against Wang and Ge (the "Officer Defendants") and against Fanhua; and a claim for violations of § 20(a) against the Officer Defendants and Lai (together, the "Individual Defendants").

Pending now are defendants' motions to dismiss the FAC for failure to state a claim under Federal Rules of Civil Procedure 12(b)(6) and 9(b). For the following reasons, the Court grants the motion and dismisses the FAC in its entirety.

## I. Background[2]

### A. The Parties

Fanhua—known before December 2016 as CNinsure, Inc. ("CNinsure")—is a financial services provider incorporated in the Cayman Islands, with principal executive offices in China.

---

[2] These facts are drawn primarily from the FAC. Dkt. 27. For the purpose of resolving the motion to dismiss, the Court assumes all well-pled facts to be true and draws all reasonable inferences in favor of plaintiffs. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). The Court has also considered the documents attached to the declaration of Adam T. Humann in support of Fanhua's motion to dismiss, Dkt. 35 ("Humann Decl."), the documents attached to the declaration of Alex S. Zuckerman in support of Fanhua's motion to dismiss, Dkt. 41 ("Zuckerman Decl."), and the documents attached to the declaration of Cara David in opposition to the Individual Defendants' motion to dismiss, Dkt. 52 ("David Decl.").

Because these documents were incorporated into the FAC by reference, or are matters of public record, they are properly considered on a motion to dismiss. *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 179 (2d Cir. 2014) (in resolving a motion to dismiss, the court may consider, *inter alia*, "any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit"); *see also Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000) ("[T]he district court may take judicial notice of well-publicized stock prices."). The Court considered these documents "not for the truth of the matters asserted therein," but only "for the fact that the statements were made." *Clark v. Kitt*, No. 12 Civ. 8061 (CS), 2014 WL 4054284, at *7 (S.D.N.Y. Aug. 15, 2014); *see also, e.g.*, *Finn v. Barney*, 471 F. App'x 30, 32 & n.1 (2d Cir. 2012) (district court did not abuse its discretion in taking judicial notice of SEC filings, news articles regarding SEC order, and a section of a website containing disclosure information, where judicial notice was "for the purpose of establishing that the information was publicly available . . . [and the court] did not consider the documents for their truth"); *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008) ("[I]t is proper to take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents." (emphasis omitted)); *Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006) ("For purposes of a 12(b)(6) motion to dismiss, a court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and it is capable of accurate and ready determination." (internal quotation marks and citation omitted)).

FAC ¶¶ 2, 19.  Through its online platforms and offline sales-and-service network, Fanhua offers

a variety of property-and-casualty and life insurance products and services.  *Id.* ¶¶ 2, 36, 42.  The

company's distribution and service network covers 31 provinces in China and consists of

approximately 754 sales and service outlets, 579,000 sales agents, and 1,200 claims adjustors.

*Id.* ¶ 42.  Fanhua's American Depositary Shares ("ADSs") are listed on NASDAQ under the

symbol "FANH."[3]  *Id.* ¶ 19.

The individual defendants are Qiuping Lai, Chunlin Wang, and Peng Ge.

Lai co-founded Fanhua's predecessor entity in 1998 and, between 2004 and 2016, served

as its president and as a director.  *Id.* ¶ 22, 35–36.  On March 29, 2016, Lai retired from his

leadership positions at Fanhua, *id.* ¶ 23, which was then embroiled in a scandal involving the

People's Insurance Company (Group) of China.  *Id.* ¶¶ 4, 23.  Thereafter, Lai was no longer an

officer or director of Fanhua, but he remained its largest principal shareholder.  *Id.* ¶ 4.

---

[3] As the Second Circuit has explained:

> [I]n order for a foreign corporation to trade on the American stock exchange without listing its ordinary shares on the exchange, the foreign corporation must issue and deposit American Depositary Shares or ADSs with an American financial institution.  The depositary institution then issues American Depositary Receipts or ADRs to the beneficial owners of the ADSs, who are then free to sell the ADSs on American securities exchanges.  The listing of ADSs on an American exchange makes trading an ADR simpler and more secure for American investors than trading in the underlying security in the foreign market.

> ADSs share several of the same characteristics as ordinary shares.  For example, ADRs are tradeable in the same manner as any other registered American security, may be listed on any of the major exchanges in the United States or traded over the counter, and are subject to the [federal securities laws.]

*Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 464 (2d Cir. 2010) (internal quotation marks and citations omitted).

Wang has served as Fanhua's chief executive officer ("CEO") since 2011, as a director on Fanhua's board since 2016, and as chairman of its board since 2017. *Id.* ¶ 20. Wang joined Fanhua's predecessor entity at its founding in 1998. *See id.* ¶ 37.

Ge has served as Fanhua's chief financial officer ("CFO") since 2008 and as a director on Fanhua's board since 2016. *Id.* ¶ 21. Ge joined Fanhua's predecessor entity in 1999. *Id.* ¶ 38.

Lead plaintiff Miao, an individual shareholder, bought Fanhua ADSs during the Class Period. *Id.* ¶¶ 1, 18.

## B. Fanhua's Alleged Business Activities

Miao alleges that "[d]efendants engaged in a brazen undisclosed scheme whereby Lai used Fanhua's cash and assets for his personal benefit." *Id.* ¶ 44. Miao alleges three undisclosed schemes, involving: (i) related-party dispositions to Lai; (ii) financial guarantees for investment products that Lai issued; and (iii) an ADS repurchase from Lai in connection with an employee incentive plan.

In support of these allegations, Miao relies almost exclusively on three short-seller reports,[4] which his FAC incorporates and from which it quotes extensively: (1) an August 27, 2018 report by Seligman Investments, Humann Decl., Ex. 6 (the "Seligman Report"); (2) a January 17, 2019 report published by J Capital Research USA LLC, *id.*, Ex. 4 (the "JCap Report"); and (3) a February 7, 2019 report by GeoInvesting, *id.*, Ex. 9 (the "GeoInvesting Report").

---

[4] "A 'short seller' speculates that a particular stock will go down in price and seeks to profit from that drop." *Harris v. Am Tr. Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 159 n.1 (S.D.N.Y. 2015), *aff'd*, 649 F. App'x 7 (2d Cir. 2016).

### 1. Fanhua's Alleged Related-Party Dealings with Lai

In 2011, CNinsure acquired 100% equity interests in two insurance agencies, Guangdong Huajie and Dongguan Zhongxin Insurance Agency Co., Ltd. ("Dongguan Zhongxin"), from Chengdu Jingshi Investment Co., Ltd. FAC ¶ 39. The purchase price was approximately 25 million China Yuan Renminbi ("RMB") (equal to about $8 million). *Id.* Lai—then president and a director of Fanhua's predecessor—was, through a series of corporate entities, the 100% owner of Guangdong Huajie. *Id.*

In 2016, Fanhua divested Guangdong Huajie and Dongguan Zhongxin. *Id.* ¶ 45. According to Miao, these transactions were disclosed in Fanhua's 2017 Form 20-F, but Fanhua failed to disclose that Lai was the recipient of these assets at the "bargain basement price[]" of RMB 30,712. *Id.* In fact, the disclosure cited by the FAC states that that price is recited "[i]n thousands," such that the actual consideration Fanhua disclosed receiving was RMB 30,712,000. *See* Zuckerman Decl., Ex. 14 (April 20, 2018 Form 20-F) ("2017 Form 20-F") at F-31; *id.*, Ex. 15 (April 19, 2017 Form 20-F) ("2016 Form 20-F") at F-26. In other words, Miao's FAC omitted three zeros from the sale price, and Fanhua, in fact, recognized gain of approximately RMB 3 million on the divestiture. The JCap Report, on which the FAC relies, contained the same error. JCap Rpt. at 32 ("In 2011, the company paid its co-founder and president Lai Qiuping about $7.9 m[illion] for two companies he owned, Guang[dong] Huajie and Dongguan Zhongxin, which Fanhua then divested in 2016 for about $30,000 [to Lai].").[5]

Additionally, in October 2017, Fanhua disposed of 19 property and casualty subsidiaries to the entity Beijing Cheche Technology Co., Ltd. ("Cheche"), for approximately RMB 225.4

---

[5] Moreover, Fanhua's public filings on August 4, 2016 and February 13, 2017 disclosed that Huajie is "100% owned by Mr. Lai." Humann Decl., Ex. 10 (August 4, 2016 Schedule 13G/A at 6); *id.*, Ex. 11 (February 13, 2017 Schedule 13G/A at 5).

million ($34.6 million).  *Id.* ¶ 46.  Miao alleges that—despite Fanhua's disclosure in its 2017

Form 20-F that Cheche was a "third party" buyer—Cheche:

> is in fact owned or controlled by Lai, as demonstrated by the following: Shenzhen Ruiyuan Investment Company (Limited Partnership), which is an owner of Cheche, was registered at the same address in Shenzhen, China, and at approximately the same time as several Fanhua subsidiaries and at the same address and time as Lai's investment vehicle Chengchuang Shenzhen.  Moreover, several Cheche operating entities in Guangzhou, China, share an office with Fanhua entities and one of Lai's companies.

*Id.* ¶ 47.  The JCap Report, on which the FAC relies for the Cheche allegations, further states that

"[t]he shared location is not itself proof of a connection; the address accommodates hundreds of

companies."  JCap Rpt. at 16.  Rather, the address is that of a "Shenzhen government agency that

handles registration and bookkeeping for companies for a fee."  *Id.* at 17.

### 2. Fanhua's Repurchase of ADS from Lai

In a June 15, 2018 Form 6-K filed with the SEC, Fanhua disclosed a plan to provide

incentive compensation in the form of 15 million Fanhua ADSs[6] to its key sales personnel (the

"521 Development Plan").  FAC ¶¶ 7, 56.  Of the 15 million ADSs, Wang, Ge, and certain board

members intended personally to purchase 1 million shares of Fanhua's ADS, and the rest would

be purchased by a Fanhua Entrepreneurial Fund ("Fanhua Fund"), to which eligible employees

could subscribe in connection with the 521 Development Plan.  *Id.* ¶ 58.

Although Fanhua disclosed that 8.5 million of the 15 million ADSs were going to be

repurchased from "a principal shareholder," Miao alleges that Fanhua failed to disclose that these

8.5 million ADSs would be repurchased from Lai, *id.* ¶ 60, representing 85% of Lai's holdings

of Fanhua ADS at the time, *id.* ¶ 61.  Fanhua disclosed that the principal shareholder would

---

[6] The company had approximately 65 million ADS outstanding at the time.  FAC ¶ 59.

receive $29.00 per ADS, representing the average closing price of the 30 trading days prior to June 14, 2018, for a total of approximately $246.5 million.[7] *Id.*

In short, Miao alleges that "whereas Fanhua presented this stock acquisition plan as intended to fund an employee incentive program, it was in fact a cover for a buyout of most of Lai's Fanhua shares and funneling of a substantial portion of the Company's cash on hand into his coffer." *Id.* ¶ 62.

### 3. Fanhua's Alleged Guarantees of Lai's Investment Products

In the "Off-Balance Sheet Commitments and Arrangements" section of the 2017 Form 20-F, Fanhua disclosed that it "ha[s] not entered into any financial guarantees or other commitments to guarantee the payment obligation of third parties." *Id.* ¶ 48; 2017 Form 20-F at 67. Based entirely on interviews of Fanhua personnel conducted by JCap, Miao alleges that, despite this disclosure, "Fanhua guarantees handsome returns" on "financial products that Lai issues in China to investors." FAC ¶ 49. Miao's allegations as to this scheme are phrased entirely in terms of what "interviewees" stated to JCap on a confidential basis; there is no allegation that Miao or Miao's counsel had any contact with the interviewed personnel. *See id.* ¶¶ 33–34, 48–55, 64.

According to Miao, four unnamed "longtime Fanhua employees" told JCap "that the Company guarantees Lai's investment products, including guarantees of both principal and returns of between 6.8% and 8.5% to investors" in Lai's funds, *id.* ¶ 50, such as Chengchuang Shenzhen, "a fund that manages trusts and private-equity funds," *id.* ¶ 49. These interviewees,

---

[7] According to Miao, for the fiscal year ended 2017, Fanhua generated total net revenues of approximately RMB 4.09 billion ($628 million) and net income of RMB 452 million ($69 million). FAC ¶ 43. In 2017, the Company generated net cash of RMB 176 million ($27 million); as of December 31, 2017, it had cash and cash equivalents of RMB 364 million ($56 million). *Id.*

otherwise undescribed, included an employee "working at Fanhua in a financial role" and a sales agent. *Id.* ¶ 51.

Additionally, Miao alleges that: "[s]everal interviewees" told JCap that "Fanhua's sales professionals and agencies also sell Lai's investment products, including those from Chengchuang Shenzhen . . . [and] Chengdu Chuangjiarui," *id.* ¶ 52; "[a]t least one sales agent that works with Fanhua and Lai's investment products," told JCap that "Fanhua's guarantees are in the purchase contracts that Lai's investment clients are able to review after they commit capital to Lai's funds," *id.* ¶ 53; "[a] manager at Puyi Wealth Management, which Fanhua owns a stake of and whose financial products Fanhua sells, told JCap that Fanhua agreed to make the payment on Lai's trust products if there are defaults," *id.* ¶ 54; and "former employees" in Fanhua's "finance divisions" told JCap that "Fanhua backed and paid for two defaults by Lai's entities," *id.* ¶ 55.

### C. Statements During the Class Period

#### 1. The 2017 Form 20-F

On April 20, 2018, Fanhua filed its 2017 Form 20-F with the SEC. *Id.* ¶ 6. Wang and Ge signed the 2017 Form 20-F and provided certifications under Sections 302 and 906 of the Sarbanes-Oxley Act of 2002. *Id.* ¶ 63.

##### a. *Statements Regarding Related-Party Dealings*

In the 2017 Form 20-F, Fanhua stated, with regard to the disposition of Guangdong Huajie and Dongguan Zhongxin:

> During the year ended December 31, 2016, the Group disposed of three subsidiaries, including . . . Guangdong Huajie Insurance Agency Co., Ltd. . . . and Dongguan Zhongxin Insurance Agency Co., Ltd. . . . , for a total cash consideration of RMB30,712. . . .

As of December 31, 2016, the Group has completed the closing procedures of all the above transactions and has effectively transferred its control of Shandong Mintai, Guangdong Huajie and Dongguan Zhongxin to the respective buyers.

*Id.* ¶ 67. Miao claims that these statements were materially false and misleading because, as described above, Fanhua allegedly failed to disclose that these assets were conveyed at "bargain basement prices" to an entity owned by Lai. *Id.* ¶ 68.

Similarly, with regard to the disposition of property-and-casualty subsidiaries to Cheche, Fanhua stated:

[W]e entered into a share purchase agreement with Cheche, which operates an online auto insurance platform. Under this agreement, we disposed of the equity interests in 19 P&C insurance intermediary subsidiaries, to Cheche for a total consideration of approximately RMB225.4 million (US$34.6 million), including approximately RMB95.4 million cash consideration and RMB130.0 million in the form of a convertible loan receivable, which is convertible or collectible in three years and recognized as other non-current assets.

\*\*\*

[T]he Group disposed of the equity interests in Fanhua Times Sales & Service Co., Ltd., and its subsidiaries which primarily conduct P&C insurance business (collectively, the "P&C Insurance Division") to a third party, call Beijing Cheche Technology Co., Ltd. ("Cheche"), for a consideration including a convertible loan receivable.

*Id.* ¶ 65. Miao claims that these statements were materially false and misleading because, as described above, Lai allegedly had a substantial stake in Cheche, which therefore was not an independent third party. *Id.* ¶ 66.

*b.* *Statements Regarding Financial Guarantees*

In the 2017 Form 20-F, Fanhua further stated, with regard to "Off-Balance Sheet Commitments and Arrangements":

We have not entered into any financial guarantees or other commitments to guarantee the payment obligations of third parties. . . . Furthermore, we do not have any retained or contingent interest in assets transferred to an unconsolidated entity that serves as credit, liquidity or market risk support to such entity. We do not have any variable interest in any unconsolidated entity that provides financing, liquidity, market risk or credit support to us[.]

*Id.* ¶ 63.  Miao claims that these statements were materially false and misleading because, as

described above, Fanhua allegedly provided financial guarantees for the principal and returns of

up to 8.5% for investment products that Lai issued.  *Id.* ¶ 64.

c.      *Statement Regarding Influence over Company Decisions*

In the 2017 Form 20-F, Fanhua also disclosed a "[r]isk[] [r]elated to [o]ur ADSs" that:

> As of March 31, 2018, our executive officers, directors and principal shareholders beneficially owned approximately 42.8% of our outstanding shares.  These shareholders could exert substantial influence over matters requiring approval by our shareholders, including electing directors and approving mergers or other business combination transactions, and they may not act in the best interests of other noncontrolling shareholders.  This concentration of our share ownership also may discourage, delay or prevent a change in control of our company, which could deprive our shareholders of an opportunity to receive a premium for their shares as part of a sale of our company and might reduce the price of our ADSs.  These actions may be taken even if they are opposed by our other shareholders.

2017 Form 20-F at 21; *see* FAC ¶¶ 4, 25.  Miao alleges that Lai, as a principal shareholder,

"could exert substantial influence over matters requiring approval by our shareholders . . . ."

FAC ¶¶ 4, 25.

2.      **The June 15, 2018 Form 6-K**

On June 15, 2018, Fanhua filed a Form 6-K with the SEC, which Wang signed.  *Id.*

¶¶ 56, 69.  In the June 15, 2018 6-K, Fanhua disclosed, with regard to the 521 Development

Plan, that "[o]f the 14 million ADSs available to participants in [the incentive compensation

plan] and the 1 million ADS to be purchased by management and board members, **8.5 million**

**ADSs will be purchased from a principal shareholder** at $29.0 per ADS."  *Id.* ¶ 69 (emphasis

added).  The FAC alleges that, at the time, Lai was not the only principal shareholder.  *Id.*  The

6-K further stated that the:

> [B]oard is confident this will further strengthen its cash generation capabilities. . . . The 521 Development Plan enables us to mobilize all of our . . . material and financial resources to focus on the growth of the highly valuable long-term life insurance business, which can bring in strong and steady cash flow to the Company.

. . . We have strong cash position and expect stronger cash generation capabilities as a result of the 521 Development Plan.

*Id.* The FAC alleges that these statements were materially false and misleading in several respects. First, Miao alleges that the true beneficiary of the 521 Development Plan was not the company but Lai, who was selling 85% of his Fanhua ADS holdings through the Plan. *Id.* ¶ 70. Second, Miao claims that Fanhua failed to disclose that the Plan "would suck out a substantial portion of [the company's] cash on hand, again for the sole benefit of Lai." *Id.* And, third, Miao alleges that the Plan was actually a related-party transaction between the company and Lai, due to Lai's stock ownership and alleged influence within the company. *Id.*

### 3. The 521 Development Plan Conference Call

On June 18, 2018,[8] the next trading day after the issuance of the June 15, 2018 Form 6-K disclosing the 521 Development Plan, Fanhua convened an investor conference call to discuss the Plan. *See* Humann Decl., Ex. 7 ("521 Development Plan Conference Call Transcript" or "Conference Call Tr.").[9] On the call, the company disclosed that Lai was the "principal

---

[8] The call was held June 19, 2018 at 1 a.m. GMT, meaning it was the evening of Monday, June 18, 2018, in this District, and the morning of Tuesday, June 19, 2018, in China.

[9] Miao urges the Court not to take judicial notice of this call transcript. *See* Dkt. 36 ("Pl. Mem.") at 16–18. Courts in this District regularly take notice of such investor call transcripts, not for the truth of the matters asserted therein, but to reflect what was stated. *See, e.g.*, *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 205 (S.D.N.Y. 2018), *aff'd sub nom. Kapitalforeningen Lægernes Invest v. United Techs. Corp.*, 779 F. App'x 69 (2d Cir. 2019); *Pehlivanian v. China Gerui Advanced Materials Group, Ltd.*, 153 F. Supp. 3d 628, 643 (S.D.N.Y. 2015); *see generally supra* note 2. The cases Miao cites are not to the contrary. For example, in *Khoja v. Orexigen Therapeutics, Inc.*, the Ninth Circuit noted that courts regularly take judicial notice of investor call transcripts, but held that the district court had erred in adopting a construction of a portion of a particular transcript that was "subject to varying interpretations" such that there was "reasonable dispute as to what the transcript establishes." 899 F.3d 988, 999–1000 (9th Cir. 2018) (internal quotation marks and citation omitted). Here, in contrast, there is no dispute as to the authenticity of the transcript or the meaning of the relevant statements reflected in it. Accordingly, the Court takes judicial notice of the transcript.

shareholder," discussed in the Form 6-K, whose shares would be repurchased pursuant to the

Plan. Specifically, Wang, speaking through a translator, stated:

> I would like to give some background about the counter-party of the transaction for the purchase of 8.5 million ADS, Master Trend Limited. . . . Firstly, the seller of the 8.5 million ADS is Master Trend. According to its latest filing on schedule 13G amendment, Master Trend beneficia[ll]y owned an equivalent of approximately 10 million ADS of Fanhua, representing 15.46% of our total share capital as of date. . . . To our knowledge, Master Trend is a Hong Kong registered investment company set up by Shenzhen (CC) Investment Co. [Ltd.] for overseas public equity investment purpose. CC Investment is a [Chinese]-registered and property licensed private equity firm. **Mr. Qiuping Lai is the principal general partner of CC Investment. Mr. [Lai] is one of the earliest founders and former President of Fanhua.**

Conference Call Tr. at 4 (emphasis added).

### D. Alleged Corrective Disclosures

The FAC alleges two corrective disclosures during the Class Period.

First, on Monday, August 27, 2018, short-seller Seligman Investments published the

Seligman Report on the website "Seeking Alpha." FAC ¶ 71. The Seligman Report stated, with

regard to the 521 Development Plan that Fanhua had disclosed in June 2018:

> We believe that company insiders have quickly resorted to the same self-dealing tactics that they used in 2010/2011.[10] This behavior has become blatant in the last few weeks, and involves the co-founder selling approximately $250mm of stock to the company[.] . . . We cannot recall a company transferring cash from the company's balance sheet to the founder on this scale and in one transaction. . . .

> Simultaneous with the related-party transaction above, management implemented a complex incentive scheme that we believe will enable further siphoning of cash to related party entities. This scheme is almost identical to one that they implemented in the past. We believe that this scheme, when combined with the $250mm related party transaction just announced with the founder, is likely to drain 91% of the company's current cash balance.

---

[10] This statement regarding self-dealing tactics, according to Miao, refers to a separate equity-incentive compensation scheme that was the subject of fraud claims brought against defendants Fanhua (then, CNinsure), Ge, and Lai. FAC ¶ 84. The parties to that case settled the litigation for $6,625,000 after defendants' motion to dismiss was denied. *Id.*; *see Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 479 (S.D.N.Y. 2013).

*Id.* (emphasis omitted). The Seligman Report, quoted extensively by and incorporated by reference into the FAC, disclosed Seligman Investments' "current[] short position[]" and "inten[tion] to continue transacting" in Fanhua's ADSs. Seligman Rpt. at 1. After publication of the Seligman Report, Fanhua's ADS price fell from its Friday, August 24, 2018 closing price of $26.15 per share to a closing price of $23.40 on Monday, August 27, 2018. Humann Decl., Ex. 8 (Fanhua historical stock prices); *see* FAC ¶ 72; Pl. Mem. at 8 n.6.

Second, on Thursday, January 17, 2019, short-seller JCap published the JCap Report. FAC ¶ 73. As reviewed above, it accused Fanhua of, *inter alia*: (i) divesting Guangdong Huajie and the property-and-casualty subsidiaries to Lai-controlled entities at bargain basement prices; (ii) guaranteeing financial products sold by Lai's privately-owned company; and (iii) using the 521 Development Plan to enrich Lai. *Id.* JCap also disclosed that it "or [its] clients may be short shares of FANH, and for this reason, there might be a conflict of interest." JCap Rpt. at ECF p.3. After publication of the JCap Report, Fanhua's ADS price fell from its Wednesday, January 16, 2019 closing price of $22.95 per share to close at $20.10 on January 17, 2019, FAC ¶ 74, although the stock price recovered to close at $23.01 the next day. Humann Decl., Ex. 8 (Fanhua historical stock prices).

### E. Post-Class Period Developments

On February 7, 2019, after the alleged Class Period, short-seller "GeoTeam" published the GeoInvesting Report. FAC ¶ 76. GeoInvesting is a research firm that publishes information regarding stocks, options, futures, bonds, derivatives, commodities, currencies, or other securities. *Id.* The GeoInvesting Report disclosed that the GeoTeam was "[s]hort FANH at [the] time of [the] report." GeoInvesting Rpt. at 4. The GeoInvesting Report agreed with the JCap Report, concluding that "[w]e believe [Fanhua's] denial [of the allegations in the JCap Report] is an outright lie." FAC ¶ 78 (emphasis omitted) (quoting at length the GeoInvesting Report).

Among other issues, the GeoTeam pointed to "the divestment of the 19 [property-and-casualty] subsidiaries to Cheche" as potentially "involv[ing] funneling money/interests." *Id.* (quoting the GeoInvesting Report). The GeoInvesting Report also faulted Fanhua for a "general lack of trustworthiness." *Id.*

On February 13, 2019, Fanhua announced that its board had formed an independent special committee to conduct an independent review of the issues raised in JCap, Seligman, and GeoInvesting Reports. *Id.* ¶ 80.[11]

### F. Procedural History

On September 7, 2018, Miao filed his initial complaint, citing the then-recently published Seligman Report. Dkt. 1. On November 6, 2018, Miao filed the lone lead-plaintiff application in this litigation. Dkt. 12. On December 13, 2018, the Court granted Miao's motion for appointment as lead plaintiff and approved his counsel as lead counsel. Dkt. 21.

On February 21, 2019, Miao filed the operative FAC. Dkt. 27. It added allegations based on the JCap and GeoInvesting Reports, which were published after the filing of Miao's initial complaint. *See generally id.* ¶¶ 10–12, 32–34, 45–61, 73–79.

On April 1, 2019, Fanhua filed a motion to dismiss, Dkt. 33, a memorandum in support, Dkt. 34 ("Fanhua Mem."), and the Humann Declaration. At that time, the Individual Defendants, who reside abroad, had not yet been served. On May 1, 2019, Miao filed a

---

[11] On May 23, 2019, Fanhua filed a Form 6-K with SEC, which included as an exhibit a press release stating that the independent special committee, with the help of a retained law firm and forensic accountants, had completed its investigation and concluded that the "short seller reports proved to contain baseless speculation and misleading an inaccurate allegations." Zuckerman Decl., Ex. 1 (May 23, 2019 Form 6-K, Ex. 99.1) at 2. The Court takes notice of this SEC disclosure for the fact of its filing, not for the truth of the company's assertion that the short-seller reports were baseless.

memorandum in opposition.  Pl. Mem.  On May 24, 2019, Fanhua filed a reply, Dkt. 40 ("Fanhua Reply"), and the Zuckerman Declaration.

On August 15, 2019, Ge and Lai, who by then had been served, filed a notice of joinder in Fanhua's motion and a motion to dismiss the FAC, Dkt. 48, a memorandum in support, Dkt. 49 ("Indiv. Defs. Mem."), and the second declaration of Adam T. Humann, Dkt. 50.  The motion also sought to have the claims against Wang dismissed for insufficient service of process, pursuant to Federal Rule of Procedure 12(b)(5).  Indiv. Defs. Mem. at 2–3.  On August 29, 2019, Miao filed a memorandum in opposition, Dkt. 51, and the declaration of Cara David in opposition, Dkt. 52.  On September 5, 2019, Ge and Lai filed a reply, Dkt. 53.

On October 15, 2019, Wang, who had been served on September 23, 2019, filed a notice of joinder in the two previously filed motions to dismiss.  Dkt. 54.

## II.     Applicable Legal Standards

### A.     Standards for Resolving a Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.  Although the court must accept as true all well-pled factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor, *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014), that tenet "is inapplicable to legal conclusions," *Iqbal*, 556 U.S. at 678.

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321–23 (2007).

First, a complaint alleging securities fraud must meet the requirements of Federal Rule of Civil Procedure 9(b). *See ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) ("*ECA*"). Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI Commc'ns*, 493 F.3d at 99.

Second, such a complaint must comply with the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4(b). *See ECA*, 553 F.3d at 196. In particular, where a plaintiff's claims depend upon allegations that the defendant has made an untrue statement of material fact or that the defendant omitted a material fact necessary to make a statement not misleading, the plaintiff "shall specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1). Thus, to plead a claim of securities fraud, plaintiffs "must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004). In addition, the plaintiff "shall, with respect to each act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

### B. Elements of Plaintiff's Claims

Miao asserts claims under §§ 10(b) and 20(a) of the Exchange Act, and Rule 10b-5. FAC ¶¶ 94–112.

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). The SEC's implementing rule, Rule 10b-5, provides that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5.

To state a claim under § 10(b) of the Exchange Act, a plaintiff must adequately plead "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011) (internal quotation marks and citation omitted).

To state a claim under § 20(a) of the Exchange Act, "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (quoting *ATSI Commc'ns*, 493 F.3d at 108) (quotation marks omitted). If a plaintiff has not adequately alleged a primary violation, *i.e.*, a viable claim under another provision of the Exchange Act, then the § 20(a) claims must be dismissed. *See id.*

Three elements of these statutes are implicated by defendants' challenge to the FAC: those requiring false or misleading statements or omissions, scienter, and loss causation.

### 1. False or Misleading Statements or Omissions

To survive a motion to dismiss, the complaint must adequately plead "that the defendant made a statement that was 'misleading as to a material fact.'" *Matrixx Initiatives*, 563 U.S. at 38 (emphasis omitted) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)). Section 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material information." *Id.* at 44; *see also Basic*, 485 U.S. at 239 n.17. "Disclosure of . . . information is not required . . . simply because it may be relevant or of interest to a reasonable investor." *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002). An omission of information not affirmatively required to be disclosed is, instead, actionable only when disclosure of such information is "necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives*, 563 U.S. at 44 (quoting 17 C.F.R. § 240.10b–5(b)); *see also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239–40 (2d Cir. 2016) ("pure omissions" of information, absent a duty to disclose, are not actionable; however, "half-truths"—"statements that are misleading . . . by virtue of what they omit to disclose"—are).

The materiality requirement, meanwhile, "is satisfied when there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" *Matrixx Initiatives*, 563 U.S. at 38 (quoting *Basic*, 485 U.S. at 231–32). As the Supreme Court has explained, a lower standard—such as defining a "material fact" as any "fact which a reasonable shareholder might consider important"—would lead corporations to "bury the shareholders in an avalanche of trivial information[,] a result that is hardly conducive to informed decisionmaking." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448–49 (1976). The "materiality hurdle" is,

therefore, "a meaningful pleading obstacle." *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013). However, because of the fact-intensive nature of the materiality inquiry, the Court may not dismiss a complaint "on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA*, 553 F.3d at 197 (quotation marks omitted).

### 2.    Scienter

As noted, Rule 9(b) and the PSLRA require plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). "For an inference of scienter to be strong, 'a reasonable person [must] deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged,'" and "the court must take into account plausible opposing inferences." *ATSI Commc'ns*, 493 F.3d at 99 (quoting *Tellabs*, 551 U.S. at 324) (alteration and emphasis in original). The requisite mental state is one "embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319 (quotation marks and citation omitted).

Plaintiffs "may satisfy this requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns*, 493 F.3d at 99. Where plaintiffs do not sufficiently allege that defendants had a motive to defraud the public, they "must produce a stronger inference of recklessness." *Kalnit v. Eichler*, 264 F.3d 131, 143 (2d Cir. 2001).

Recklessness is "a state of mind approximating actual intent, and not merely a heightened form of negligence." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (citation and emphasis omitted). To qualify as reckless, defendants' conduct must

have been "highly unreasonable" and "an extreme departure from the standards of ordinary care." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (quoting *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978)) (quotation marks omitted).

A plaintiff can establish recklessness by adequately alleging that "defendants knew facts or had access to non-public information contradicting their public statements" and therefore "knew or should have known they were misrepresenting material facts." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001) (citing *Novak*, 216 F.3d at 308). In other words, defendants have acted recklessly if they "understood that their public statements were inaccurate, or were 'highly unreasonable' in failing to appreciate that possibility." *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 534 (S.D.N.Y. 2015) (quoting *Novak*, 216 F.3d at 308), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016). "The key, of course, is the honest belief of the management in the truth of information issued to the public." *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 470 (S.D.N.Y. 2008), *aff'd sub nom. State Univ. Ret. Sys. of Ill. v. Astrazeneca PLC*, 334 F. App'x 404 (2d Cir. 2009).

### 3.    Loss Causation

To state a claim for securities fraud under § 10(b) and Rule 10b-5, plaintiffs must also adequately plead loss causation. *Stoneridge Inv. Partners, LLC*, 552 U.S. at 157.

"Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *In re Lehman Bros. Sec. & Erisa Litig.*, 799 F. Supp. 2d 258, 304 (S.D.N.Y. 2011) (internal quotation marks omitted). "To make out loss causation, 'a plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered.'" *Id.* (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010)). A plaintiff may establish loss causation by demonstrating either "(1) a corrective

disclosure or (2) a materialization of a concealed risk." *In re Lehman Bros. Sec. & Erisa Litig.*, 799 F. Supp. 2d at 304.[12]

"[P]laintiffs need not allege that their entire loss was caused by the misstatements and omissions complained of." *Id.* at 305. "To plead loss causation, the complaint must allege facts that support an inference that [the defendants'] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of . . . that loss absent the fraud." *Id.* (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005)). "Nor are plaintiffs required to allege that the particular misstatements and omissions directly caused the alleged losses. . . . [M]isstatements or omissions that conceal a risk, the materialization of which causes all or part of the plaintiffs' loss, . . . suffice." *Id.*

## III. Discussion

Miao brings claims under § 10(b) of the Exchange Act and Rule 10b-5 against Fanhua and the Officer Defendants, and claims under § 20(a) of the Exchange Act against all defendants. Miao's claims stem from three categories of alleged misstatements or omissions: (i) statements relating to alleged related-party dispositions; (ii) statements relating to the 521 Development Plan; and (iii) statements relating to alleged financial guarantees of financial products issued by entities owned by Lai.

---

[12] To demonstrate a materialization of a concealed risk, a plaintiff "must allege that the loss was (1) foreseeable and (2) caused by the materialization of the concealed risk." *In re Lehman Bros. Sec. & Erisa Litig.*, 799 F. Supp. 2d at 304. "A loss is foreseeable if it is within the zone of risk concealed by the misrepresentations and omissions alleged by the disappointed investor." *Id.* at 305 (internal quotation marks omitted).

Defendants argue that the § 10(b) claims fail as to each category because the FAC does not plead an actionable misstatement or omission, scienter, and loss causation. Defendants argue that the § 20(a) claim fails because the FAC has not pled a primary § 10(b) violation. The Individual Defendants argue that the FAC does not allege that any Individual Defendant was a culpable participant in the alleged fraud. Finally, Lai argues that the FAC fails to allege that he controlled Fanhua.[13]

The Court addresses each category of statements in turn.

## A. Statements Regarding Alleged Related-Party Transactions

The FAC alleges that defendants made false statements regarding two transactions purportedly between Fanhua and Lai: the 2016 disposition of Guangdong Huajie and other insurance agency subsidiaries to a Lai-controlled entity, and the 2017 disposition of 19 property-and-casualty subsidiaries to Cheche. The claim relating to Huajie is based on allegations that Fanhua had received only RMB 30,712 for the subsidiaries, which it had purchased for RMB 25,000,000 just a few years earlier. The claim relating to the property-and-casualty subsidiaries is based on allegations that an entity the FAC alleges is an owner of Cheche shared an address with certain Lai-controlled entities, and, thus, Cheche was likely also Lai-controlled. The FAC quotes the JCap Report in support of the Huajie allegation and both the JCap and GeoInvesting short-seller reports in support of the Cheche allegation.

In challenging these allegations of fraud, Fanhua, in its opening brief, asserted that Miao (and JCap) had carelessly "misread[] the SEC filing" disclosing the Huajie transaction. In fact, Fanhua noted, its filing stated that it had actually received RMB 30,712,000 (not RMB 30,712)

---

[13] Wang initially argued, under Rule 12(b)(5), that he had not been properly served, Indiv. Defs. Mem. at 2–3, but appears to have dropped that argument after Miao perfected international service on Wang, *see* Dkt. 51 at 11–12 (Miao's explanation of the status of international service on Wang); Dkt. 54 (Wang's joinder in the previously filed motions to dismiss).

for the agency subsidiaries, netting the company a gain on its investment. Fanhua Mem. at 17 (citing 2017 Form 20-F at F-31; 2016 Form 20-F at F-26). Fanhua similarly debunked the FAC's theory that Lai secretly controlled Cheche. Fanhua noted that the JCap Report, on which Miao relies heavily for this claim, itself concedes that the shared address of the alleged Cheche owner and various Lai entities is in fact that of a "Shenzhen government agency that handles registration and bookkeeping for companies for a fee" and "accommodated hundreds of companies."[14] JCap Rpt. at 16–17; *see* Fanhua Mem. at 16.

Notably, without addressing Fanhua's arguments, Miao has abandoned this category of claims. In his opposition to the motion to dismiss, he states: "After further consideration, Plaintiff no longer pleads falsity and materiality in connection with the alleged undisclosed related-party disposals to Lai of Guangdong Huajie and the property-and-casualty businesses." Pl. Mem. at 6 n.2. The Court accordingly treats as withdrawn Miao's claims as to the purported related-party transactions.

### B.     Statements Regarding the 521 Development Plan

The FAC alleges misstatements, in Fanhua's June 15, 2018 Form 6-K, concerning the 521 Development Plan. These allegations, too, are easily put to one side, because the FAC does not plead an actionable misstatement or omission.

The June 15, 2018 6-K disclosed that "[o]f the 14 million ADSs available to participants in [the 521 Development Plan] and the 1 million ADS to be purchased by management and board members, 8.5 million ADSs will be purchased from a principal shareholder at $29.0 per ADS."

---

[14] Fanhua further represents that the address at issue serves as the official address of over 100,000 companies, citing an online third-party directory listing registered businesses by address. Fanhua, however, does not supply a basis on which the Court could take judicial notice of this website. The Court accordingly does not take such notice.

FAC ¶ 69.  The FAC alleges that this disclosure was false or misleading because: (i) it failed to identify Lai as the particular "principal shareholder," of which Miao claims there were several at the time, *id.* ¶ 60; (ii) Lai allegedly stood to benefit the most from the Plan, *id.* ¶ 70; (iii) the statement failed to disclose that the Plan "would suck out a substantial portion of [Fanhua's] cash on hand," *id.*; and (iv) given Lai's "powerfully influential position with the Company, this was not an independent but rather related party transaction," *id.*

First, Fanhua's disclosures adequately identified the source of shares to be repurchased for use in the 521 Development Plan.  The June 15, 2018 Form 6K expressly disclosed that "8.5 million ADSs will be purchased from *a principal shareholder* at $29.0 per ADS, representing the average closing price of the 30 trading days prior to June 14, 2018."  Humann Decl., Ex. 12 (June 15, 2018 Form 6-K) at Ex. 99.1-2 (emphasis added); *see* FAC ¶ 69.  In its 2017 Form 20-F, filed two months before the announcement of the 521 Development Plan, Fanhua disclosed three principal shareholders:  (i) Sea Synergy Limited, an entity wholly controlled by co-founder and current director Yinan Hu, which beneficially owned 14.6% of ordinary shares; (ii) Qiuping Lai, who beneficially owned 15.9%, including 15.5% held through his wholly-owned company Master Trend Limited; and (iii) Fosun International Limited ("Fosun"), an outside investor that beneficially owned 6.1% of ordinary shares, but only "693,036 ordinary shares in the form of ADS acquired in the open market."  2017 Form 20-F at 75–76.  In other words, by disclosing that the ADSs would be purchased from a principal shareholder, Fanhua necessarily disclosed that the counterparty to the transaction would be one of three major investors in the company, one of whom (Hu) was an actual corporate insider and another of whom (Fosun) clearly did not own 8.5 million ADSs.  Fanhua validly notes that its Form 20-F disclosures mathematically isolated Lai as the only principal shareholder who held more than 8.5 million ADSs, *see* Fanhua

Mem. at 18–19. Even if this were not so, Miao does not provide good reason (or case authority) why the "total mix of information" available to a shareholder, *Matrixx Initiatives*, 563 U.S. at 38, would have been materially different if the 521 Development Plan announcement had specified that, of the three contenders, the "principal shareholder" was Lai.

Moreover, the next trading day after the filing of the allegedly fraudulent June 15, 2018 Form 6-K, Fanhua held an investor conference call, in which Wang and Ge participated and fielded questions from research analysts. The official transcript of the call was then disclosed on Fanhua's website. *See generally* Conference Call Tr. On that call, which was devoted to providing the market with more information about the 521 Development Plan, *see id.* at 2, Wang explained:

> I would like to give some background about the counter-party of the transaction for the purchase of 8.5 million ADS, Master Trend Limited. . . . Firstly, the seller of the 8.5 million ADS is Master Trend. According to its latest filing on schedule 13G amendment, Master Trend beneficia[ll]y owned an equivalent of approximately 10 million ADS of Fanhua, representing 15.46% of our total share capital as of date. . . . **Mr. Qiuping Lai is the principal general partner of [a private equity firm that owns Master Trend]. Mr. [Lai] is one of the earliest founders and former President of Fanhua.**

*Id.* at 4 (emphasis added). This explicit disclosure demolishes Miao's claim of a material omission as to the identity of the principal shareholder to whom Fanhua had referred. Miao responds primarily that the Court should not take notice of the conference call. *See* Pl. Mem. at 15–18. But the Court properly may do so, for the fact that the statements on the call were made. *See supra* note 9, at 11.

Given these disclosures, Fanhua's statement as to the source of the 521 Development Plan shares thus was not remotely actionable. And the cases finding actionable statements or omissions, on which Miao relies in so arguing, are strikingly far afield. *See In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 760 (S.D.N.Y. 2017) (statements about purchase price of

company's key raw material "elided a central reality . . . [the price] derived from a long-running criminal scheme"); *Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92–93 (2d Cir. 2010) (disclosure of total amount of fees paid to investment adviser was materially false and misleading for mischaracterizing management fees as "other fees," in violation of SEC rules); *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 430 (S.D.N.Y. 2009) (registration statement disclosures of corporate asset sales failed to disclose that defendant executives controlled 100% of the purchaser entity); *CNinsure*, 951 F. Supp. 2d at 465, 471 (statements regarding sales agents' compensation materially misleading for failing to disclose the presence of an equity-incentive compensation plan—as opposed to failing to disclose name of principal shareholder from whom compensation plan shares would be sourced). Fanhua's disclosure—that the 521 Development Plan would involve the repurchase of shares from a principal shareholder, which the company contemporaneously identified—bears no resemblance the centrally important omissions at issue in those cases.

Second, although Miao declares that Lai was the "primary beneficiary" of the 521 Development Plan, that characterization does not make any statement (or omission) by Fanhua (or any individual defendant) false or misleading. No defendant is alleged to have expressed any views, contrary or otherwise, as to the "primary beneficiary" of the Plan. Miao's assessment that Lai benefitted more than other stakeholders from this transaction does not make Fanhua's disclosures as to it false or misleading.[15]

---

[15] In any event, to the extent that Miao implies that the transaction was unreasonable from Fanhua's perspective or that Fanhua's interests were disserved by it, Miao's depiction of Lai as the "primary beneficiary" of Fanhua's purchase is an editorial judgment, not an objective fact. To make 15 million ADS available for the 521 Development Plan, Fanhua had these options: to (i) register new shares, thus diluting existing shareholders; (ii) attempt to repurchase 15 million shares in the open market, subject to fluctuations in price; and/or (iii) negotiate with a large shareholder to repurchase a significant block of shares at a fixed price. To obtain 8.5 million of

Third, the assertion that Fanhua failed to disclose that the Plan "would suck out a substantial portion of cash on hand," FAC ¶ 70, does not make out a viable securities claim.  In support, Miao opines only that the "immediate, gargantuan siphoning of $246.5 million from Fanhua's coffers into Lai's pockets was a staggering amount compared to Fanhua's then-current cash balances, cash flows, revenues, and net income."  Pl. Mem. at 15.  But Fanhua's public filings fully disclosed these figures, including the company's cash on hand.  *See, e.g.*, 2017 20-F at 64–66.  Indeed, the very sentence on which the FAC seizes expressly disclosed the expected cost of the repurchase of Lai's shares:  "8.5 million ADSs will be purchased from a principal shareholder at $29.0 per ADS, representing the average closing price of the 30 trading days prior to June 14, 2018."  Humann Decl., Ex. 12 (June 15, 2018 Form 6-K) at Ex. 99.1-2.  Miao appears to take issue with Fanhua's exercise of judgment in allowing a "gargantuan" and "staggering" outflow of cash, but that does not make the company's accurate disclosures of these terms actionable.

Fourth, the FAC's claim that "given Lai's . . . powerfully influential position with the Company, this was not an independent but rather related party transaction," FAC ¶ 70, does not give rise to a claim of securities fraud.  As reviewed, Fanhua disclosed both Lai's relationship with the company and that the 521 Development Plan would involve a repurchase of 8.5 million ADS from a principal shareholder, quickly identified as Lai.  Neither the FAC nor the short-seller reports on which it relies concretely allege any undisclosed fact regarding the

---

the ADSs to be used in the Plan, Fanhua chose the third option, and secured a transaction price of $29 per share for that ADS repurchase, FAC ¶ 69, which was *below* the market price of $34.99 at which the ADS closed that same day, Humann Decl., Ex. 8 (Fanhua historical stock prices).   In all events, the terms of this transaction were fully disclosed.

transaction. Neither substantiates the conclusory claim that Lai improperly brought influence to bear over the company or its board in arriving at the transaction terms.[16]

The FAC therefore fails to plead any actionable misstatement or omission concerning the 521 Development Plan. The Court therefore has no occasion to address defendants' alternative arguments as to this category of allegations (*e.g.*, regarding scienter or loss causation).

### C. Statements Regarding Alleged Financial Guarantees

The FAC, relying entirely on the JCap Report's summary of statements purportedly made by anonymous interviewees, next alleges that Fanhua failed to disclose that it guaranteed principal and returns on financial products offered by Lai-controlled entities.

In its 2017 Form 20-F, Fanhua stated, with regard to "Off-Balance Sheet Commitments and Arrangements":

> We have not entered into any financial guarantees or other commitments to guarantee the payment obligations of third parties. . . . Furthermore, we do not have any retained or contingent interest in assets transferred to an unconsolidated entity that serves as credit, liquidity or market risk support to such entity. We do not have any variable interest in any unconsolidated entity that provides financing, liquidity, market risk or credit support to us[.]

FAC ¶ 63. Miao argues that this paragraph was false and misleading because "Fanhua indeed provided financial guarantees for the principal and handsome returns of up to 8.5% offered by investment products that Lai issued." Pl. Mem. at 11 (citing FAC ¶ 64).

As the FAC itself reveals, the FAC's allegations as to financial guarantees are based entirely on what "interviewees" told JCap on a confidential basis. The FAC does not allege that

---

[16] The corporate disclosures on which the FAC relies to support its § 20(a) argument that Lai controlled Fanhua further belie any suggestion that investors were misled about Lai's potential influence. The FAC there cites (1) Lai's disclosed beneficial ownership of more than 15% of outstanding shares, and (2) the general risk factor set out in Fanhua's 2017 Form 20-F, which applied to all shareholders holding more than 5% of Fanhua shares, that such shareholders "could exert substantial influence over matters requiring approval by [Fanhua's] shareholders." FAC ¶¶ 24–25; 2017 Form 20-F at 21, 75.

Miao or Miao's counsel had any contact with the interviewees. *See* FAC ¶¶ 33–34, 48–55, 64. The FAC's basis for the central factual allegation underlying this set of claims thus consists entirely of statements made by anonymous—and often vaguely described—interviewees, with whom plaintiff's counsel has not had contact, but whom counsel has learned about secondhand from citations in a short-seller's report. For the reasons that follow, the Court holds that the FAC's gaunt allegations as to this category cannot sustain a § 10(b) claim, both because they are insufficiently particular to satisfy Rule 9(b) and the PSLRA and because they fail adequately to plead defendants' scienter.

### 1. Lack of Particularity of the Facts Attributed to the JCap Report's Confidential Sources

The Court first reviews the case law that has developed in PSLRA cases in which central allegations are attributed to confidential witnesses or to allegations in short-seller reports, insofar as both of these categories are implicated here. The Court then applies the governing standards to the allegations in the FAC regarding financial guarantees.

#### a. *Confidential Witnesses*

To satisfy the PSLRA, a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *ATSI Commc'ns*, 493 F.3d at 99 (quoting 15 U.S.C. § 78u–4(b)(1)). In an attempt to meet the heightened pleading standards of the PSLRA and Rule 9(b)—including *Tellabs*' requirement that any inference of scienter be "at least as compelling as any opposing inference," 551 U.S. at 324—plaintiffs often rely, at least in part, "on information attributed to 'confidential witnesses.'" *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 952 F. Supp. 2d 633, 635 (S.D.N.Y. 2013). The case law examining

facts attributed to unidentified witnesses, however, reflects the need to view such attributions with caution and care.

The Second Circuit first addressed attributions to confidential sources in a securities fraud complaint in *Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000). The Circuit there rejected a district court's holding that such sources must be identified by name for the factual allegations attributed them to be used to satisfy the particularity requirement. Information attributed to confidential sources may be considered, the Circuit explained, in proper circumstances:

> [W]here plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false. Moreover, even if personal sources must be identified, there is no requirement that they be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged. In both of these situations, the plaintiffs will have pleaded enough facts to support their belief, even though some arguably relevant facts have been left out.

*Novak*, 216 F.3d at 314.

Where a securities fraud complaint relies on uncorroborated confidential witnesses or CWs, courts presented with challenges to particularity have, on occasion, used procedural devices to test whether such CWs in fact had made the statements attributed to them.[17]

---

[17] In *Campo v. Sears Holdings Corporation*, for example, the district court ordered that the CWs cited in the complaint be deposed at the motion to dismiss stage, for the "purpose of determining whether the confidential witnesses acknowledged the statements attributed to them in the complaint." *Campo v. Sears Holdings Corp.*, 371 F. App'x 212, 216 (2d Cir. 2010). The Second Circuit affirmed this procedure—and the ensuing dismissal of the complaint—noting that "[b]ecause [Federal Rule of Civil Procedure] 11 requires that there be a good faith basis for the factual and legal contentions contained in a pleading, the district court's use of the confidential witnesses' testimony to test the good faith basis of plaintiffs' [allegations of scienter] was permissible." *Id.* (citing Fed. R. Civ. P. 11). And in *In re Millennial Media, Inc. Securities Litigation*, No. 14 Civ. 7923 (PAE), 2015 WL 3443918, at *5–14 (S.D.N.Y. May 29, 2015), this Court expressed concern about non-compliance with Rule 11 after it emerged both that CWs whom a complaint purported to quote had reported that they had been misquoted, and that plaintiffs' counsel had never personally spoken with the witnesses the complaint quoted. The Court admonished plaintiffs' counsel for failing "to undertake rudimentary fact-checking"

More commonly, however, following *Novak*, courts in this District "will credit confidential source allegations, generally, in two situations." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 590 (S.D.N.Y. 2011). First, "when 'independent [adequately pled] factual allegations' corroborate a confidential source's statements, the requirement of a description of the source's job is loosened." *Id.* (quoting *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 493 n.10 (S.D.N.Y. 2004)). Second, in the absence of such well-pled corroborative facts, courts will "credit confidential sources whose positions and/or job responsibilities are described sufficiently to indicate a high likelihood that they actually knew facts underlying their allegations." *Id.* (citations omitted).[18]

---

before filing the complaint and directed such counsel to confirm the quotes in the complaint with all the cited CWs. *Id.* at *11 (citations omitted). Presented with numerous CWs' repudiation of facts attributed to them, plaintiffs' counsel dropped the lawsuit. *Id.* at *14; *see also Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 399 (1990) (in "[d]etermining whether an attorney has violated Rule 11 . . . [t]he court must consider factual questions regarding the nature of the attorney's prefiling inquiry and the factual basis of the pleading or other paper."); *City of Livonia Emps.' Ret. Sys. v. Boeing Co.*, No. 09 Civ. 7143 (RC), 2014 WL 4199136, at *7 (N.D. Ill. Aug. 21, 2014) ("Plaintiffs' counsel violated Rule 11(b) by filing its [securities class action complaints] without conducting a reasonable pre-filing investigation and by asserting and defending factual contentions that lacked evidentiary support.").

[18] Occasionally, courts have gone farther, suggesting that uncorroborated CWs categorically "'must be discounted' because '[i]t is hard to see how information from anonymous sources could be deemed "compelling" or how [the Court] could take account of plausible opposing inferences. Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist." *In re MRU Holdings Sec. Litig.*, 769 F. Supp. 2d 500, 516–17 (S.D.N.Y. 2011) (quoting *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756–57 (7th Cir. 2007). However, "the weight of the caselaw points in the other direction"—toward a case-specific assessment of attributions to CWs—in part "because Rule 11's requirement of good faith safeguards against dangers of the kind described in *In re MRU Holdings*." *Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*, No. 18 Civ. 299 (AJN), 2019 WL 4601644, at *17 (S.D.N.Y. Sept. 23, 2019).

At the same time, the assembled case law reflects at least four contexts in which courts have been loathe, under *Novak,* to sustain as sufficiently particular securities fraud complaints based on uncorroborated statements by CWs.

First, courts generally have not credited the statements of CWs who are insufficiently described or whose descriptions do not suggest that they had been in position to know the facts attributed to them.[19]  Second, statements of CWs that cannot situate in time relevant occurrences

---

[19] *See, e.g.*, *Frankfurt-Tr.*, 336 F. Supp. 3d at 223 (disregarding statements of five unidentified former employees because they "worked mainly within a single [company] unit, so they had no insight on how other [company] units, let alone other [company] divisions, projected aftermarket sales" (citing *Rombach*, 355 F.3d at 174)); *Glaser*, 772 F. Supp. 2d at 595 (disregarding allegations attributed to a former "senior executive" because "[m]issing from the complaint . . . is any indication of what aspect of [the company] or its management [the CW] was involved in, what [the CW's] job duties entailed, [and] what kind of access [the CW] had to" the individual defendants); *see id.* at 594 (disregarding allegations of three CWs who worked for third-party company that contracted with defendant company, not the defendant company itself); *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 376 (S.D.N.Y. 2007) (disregarding allegations of anonymous source, "an AirPrime founder—with an unspecified role (if any) at [defendant company] during the class period," for failure to sufficiently indicate source "would be in a position to know about [the company's] strategy for selling its PC Cards and whether that strategy included channel stuffing); *In re China Mobile Games & Entm't Grp., Ltd. Sec. Litig.*, No. 14 Civ. 4471 (KMW), 2016 WL 922711, at *4 (S.D.N.Y. Mar. 7, 2016) ("*In re CMGE*") (disregarding allegations of CW who worked at a subsidiary, not the company, as such testimony "could describe the anomalies of a rogue fiefdom rather than company-wide practices" (quoting *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 358 (S.D.N.Y. 2011)); *In re Lehman Bros. Sec. & Erisa Litig.*, No. 10 Civ. 6637 (LAK), 2013 WL 3989066, at *4 (S.D.N.Y. July 31, 2013) (disregarding CWs who "were loan level underwriters, not managers or corporate officers who could have spoken to the company's practices broadly"); *see also Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010) (discounting allegations of "low-level, rank-and-file employees or outside contractors" whom the complaint did not indicate had any "access to aggregated data regarding [the company's] credit risk"), *aff'd*, 430 F. App'x 63 (2d Cir. 2011).  Relatedly, where a complaint relies on information from a CW to establish scienter, the complaint must describe the nature of the CW's contact with the individual defendants that would be probative of defendants' mental state.  *See, e.g.*, *Glaser*, 772 F. Supp. 2d at 595 (failure to describe how CW was privy to individual defendant's alleged contradictory statement was "alone[] fatal to [the] allegations"); *Local No. 38*, 724 F. Supp. 2d at 460 (discounting allegations where complaint provided no indication that confidential sources had any contact with any individual defendant).

are sometimes disregarded because they cannot establish that the challenged statements were knowingly false when made.[20]  Third, allegations by CWs that are insufficiently particular are apt to be discounted or disregarded.[21]  Fourth, courts have tended not to credit uncorroborated statements of CWs who are sourced secondhand—with whom plaintiffs' counsel have not themselves interacted.[22]

---

[20] *See, e.g.*, *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 409 (S.D.N.Y. 2018) (disregarding CW allegations regarding failed clinical studies that were "unmoored in time"); *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 580 (S.D.N.Y. 2014) ("No CW sets forth facts that suggest that any of the alleged statements were false *when they were made*." (emphasis in original)), *aff'd,* 604 F. App'x 62 (2d Cir. 2015); *In re CMGE*, 2016 WL 922711, at *4 ("Plaintiffs fail to allege any actionable misstatements or omissions, because they do not allege contemporaneous falsity. . . .  Plaintiffs' inability to allege that any . . . [of the alleged undisclosed practices] occurred during the Class Period is fatal to their required showing of contemporaneous falsity); *In re Lehman Bros.*, 2013 WL 3989066, at *4 (discounting allegations where the "amended complaint does not even allege the time period in which [the confidential] witnesses worked at" the relevant entity).

[21] *See, e.g.*, *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 305–06 (S.D.N.Y. 2019) (rejecting "[g]eneric and conclusory allegations" from plaintiffs' CWs relating to bribery, mismanagement, and other alleged "strange dealings" as "so vague as to be meaningless"); *In re Lululemon*, 14 F. Supp. 3d at 581 ("general allegations" regarding quality control issues "do not render the [defendants'] statements described herein, considered in context, false or misleading," where the complaint does not also "contain the . . . required specific factual allegations (by CWs or otherwise)"); *In re Sierra Wireless*, 482 F. Supp. 2d at 376 ("[P]laintiffs have not satisfied the heightened pleading requirements for their channel-stuffing claim . . . [because the CW on whom they rely] merely parrots the conclusory allegations contained in the complaint."); *see also Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 32 n.8 (S.D.N.Y. 2016) (finding deficient the allegations of unnamed former partner of executive search firm—that "there were men who had not billed in two or three years yet were not let go, whereas women who had billed $300,000 to $500,000 were let go and denied commissions"—where complaint "does not explain what if any factual basis [the former partner] relied upon in making this claim, including how [the former partner] knew what the billings were of these other partners, male and female").

[22] For example, in *In re Lehman Brothers*, one set of allegations was based entirely "on confidential witness statements originally recounted in a separate complaint filed by separate counsel in a separate action."  *In re Lehman Bros.*, 2013 WL 3989066, at *3.  The court explained that, without independent corroboration:

> it would be inappropriate to give any weight to these alleged confidential witness statements. There is no suggestion that counsel in this action has spoken with these

The cases in which securities complaints based on statements attributed to CWs have been sustained as alleging fraud with sufficient particularity supply an illuminating contrast.  In *Employees' Retirement System of Government of the Virgin Islands v. Blanford*, 794 F.3d 297 (2d Cir. 2015), for example, the complaint alleged that a coffee manufacturer had made knowingly false misstatements about its production and inventory levels.  Although relying on CWs, the complaint "specifie[d] each [CW's] position, length of employment, and job responsibilities."  *Id.* at 307.  It recited that plaintiffs' counsel had had personal contact with these witnesses, and quoted the CWs in detail as giving specific descriptions, for example, as to "the buildup of inventory 'up to the rafters' . . . and even stored in operators' work spaces" and the "need to throw away 'pallet after pallet after pallet' as the coffee products expired."  *Id.* (citation omitted).  Witnesses recalled a specific order during the relevant time period "where 500,000 brewers were loaded onto trucks right before an audit, and put back in stock immediately after the auditors left the facility."  *Id.* (internal quotation marks omitted).  These allegations were further corroborated by other witnesses' accounts and a thorough short-seller

---

confidential witnesses or even knows who they are. . . .  When citing alleged confidential witnesses in a complaint, the [Federal Rule of Civil Procedure 11] certification means that counsel has spoken with these confidential witnesses and knows who they are.  Allowing counsel to rely on confidential witness statements recounted in a separate complaint would provide the Court little assurance that the factual contentions have any evidentiary support.

*Id.* at *4.  Differentiating between confidential statements extracted from a complaint in a lawsuit filed by different counsel and facts recounted in newspaper articles and government reports, the court noted that "the probative value of an independent news article or government report is much greater than that of confidential witness statements recounted in another complaint [because there] is significant motive and opportunity for counsel in any case to misuse or mischaracterize confidential witness statements in a pleading."  *Id.* (the "unfairness of permitting a plaintiff in a separate action to rely blindly at the pleading stage primarily on confidential witness statements from another case to meet its pleading burden is patent"); *accord In re Millennial Media*, 2015 WL 3443918, at *11.

report containing independent factual allegations. *Id*; *see also, e.g.*, *City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 362 (S.D.N.Y. 2012) (securities fraud claim adequately pled where complaint "sufficiently detail[ed] the precise title and job duties of each of the CWs"—who were employed in the relevant division of the company during the class period—"as well as their respective contacts with" the individual defendant, and facts alleged from other "public and proprietary sources of information" provided at least some corroboration).

### b.  Short-Seller Reports

Short sellers "operate by speculating that the price of a security will decrease." *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 910 F. Supp. 2d 561, 577 (S.D.N.Y. 2012). Although short sellers "can perform a useful function by bringing information that securities are overvalued to the market[,] . . . they have an obvious motive to exaggerate the infirmities of the securities in which they speculate." *Id.*

Fanhua suggests that a complaint's reliance on a short-seller report inherently requires dismissal. Fanhua Mem. at 1. That is wrong. The developing body of case law involving factual attributions to short-seller reports to satisfy pleading requirements in a securities fraud complaint instead reflects the need for similar caution and care as with respect to attributions to CWs. Courts have critically analyzed such attributions, dismissing some but generally sustaining others where independent factual allegations corroborated the factual allegation in the complaint drawn from short-sellers' reports. *Compare, e.g.*, *Harris*, 135 F. Supp. 3d at 159 (dismissing complaint that "rel[ied] almost entirely on a negative report published by a short seller [GeoInvesting]" and that, as a result, was "long on sound, fury and speculation, but . . . short on specifics"), *with McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 124 (S.D.N.Y. 2013) (denying motion to dismiss complaint that relied, in part, on short-seller report),

*and Ho v. Duoyuan Global Water, Inc.*, 887 F. Supp. 2d 547, 564 (S.D.N.Y. 2012) (same), *and In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, No. 13 Civ. 214 (HB), 2014 WL 285103, at *3–4 (S.D.N.Y. Jan. 27, 2014) (same), *and Lewy v. SkyPeople Fruit Juice, Inc.*, No. 11 Civ. 2700 (PKC), 2012 WL 3957916, at *14 (S.D.N.Y. Sept. 10, 2012) (same).

Relevant here, the case law reflects a particular need for close scrutiny where a short-seller report relied upon by a securities plaintiff itself relies on "confidential" or anonymous sources, without corroboration. In that circumstance, the risk of motivated reporting by the author of the short-seller report is twinned with the reliability concerns presented by anonymous sourcing recognized in *Novak*. *See Harris*, 135 F. Supp 3d at 159; *cf. In re Lehman Bros.*, 2013 WL 3989066, at *4. But, where courts have found that well-pled independent and particularized facts corroborate those attributed to anonymous sources in short-seller reports, courts have sustained such complaints. Two decisions from this District supply good examples of this.

In *SkyPeople Fruit Juice*, investigators for short sellers conducted in-country investigations and discovered, among other things, that the company's operations were too small to support the revenue that it claimed in its SEC filings. This finding was corroborated by documents that plaintiffs' counsel had reviewed, which showed that the revenue SkyPeople reported to the SEC was 10 times higher than the revenue it reported to Chinese financial regulators. *SkyPeople Fruit Juice*, 2012 WL 3957916, at *4–5. Additionally, the author of the main short-seller report had presented affidavits from three Chinese lawyers, identified by name, attesting to the authenticity of the Chinese documents they had obtained. *Id.* at *14. And "the bases for the investigators['] findings [were] set forth in detail, including visits to stores and production facilities, with accompanying photographs." *Id.* Further, the CWs cited in the main

short-seller report were the short seller's own investigators, who had documented their investigation in meticulous detail. *Id.* On this basis, Judge Castel concluded, "the sources, and the sources' sources, are adequately identified and/or described, and are in any event sufficiently corroborated, to plead with particularity the falsity of the financial statements." *Id.* ("[T]o the degree that the . . . reports constitute or contain anonymous sources, they are also described with adequate particularity, and their statements are corroborated by other facts.").

Similarly, in *Longwei Petroleum*, the short seller based its report alleging a petroleum company had fabricated revenue on, *inter alia*, "video surveillance of Longwei's three facilities between October and December of 2012, . . . interviews with local, unnamed residents [who stated that fuel shipments did not go in or out of the neighboring facilities during the relevant period,] . . . [and] photographs of the railroad tracks ostensibly used to deliver fuel, which showed overgrowth and rust, suggesting that they had been unused for quite some time." *In re Longwei Petroleum*, 2014 WL 285103, at *1–2 (internal quotation marks omitted). These findings were, in short order, confirmed and indeed bolstered by reports in the Chinese media. *Id.* at *2. Crucially, "[p]laintiffs' investigators independently corroborated these reports through similar interviews, photographs, and visits." *Id.* On this basis, Judge Baer held that plaintiffs had pled their claims with adequate particularity, noting that they did "not rely solely" on the key short-seller report, and that the report itself had exhibited meticulous investigation. *Id.* at *4.

### c. Application

Here, as noted, the FAC's allegations relating to financial guarantees do no more than recapitulate the JCap Report's characterization of purported interviews with anonymous sources. The FAC does not allege any independent corroborative facts, any independent investigation by counsel, or any contact by plaintiff's counsel with the interviewees. Instead, Miao, makes the following five threadbare allegations, all reliant on JCap's attributions to unnamed persons:

- Four "longtime Fanhua employees"—one of whom worked at Fanhua "in a financial role," FAC ¶ 51—told JCap "that the Company guarantees Lai's investment products, including guarantees of both principal and returns of between 6.8% and 8.5% to investors" in Lai's funds, *id.* ¶ 50, such as Chengchuang Shenzhen, "a fund that manages trusts and private-equity funds," *id.* ¶ 49;

- "Several interviewees" told JCap that "Fanhua's sales professionals and agencies also sell Lai's investment products, including those from Chengchuang Shenzhen . . . [and] Chengdu Chuangjiarui," *id.* ¶ 52;

- "At least one sales agent that works with Fanhua and Lai's investment products," told JCap that "Fanhua's guarantees are in the purchase contracts that Lai's investment clients are able to review [only] after they commit capital to Lai's funds," *id.* ¶ 53;

- "A manager at Puyi Wealth Management," a separate entity, "which Fanhua owns a stake of and whose financial products Fanhua sells, told JCap that Fanhua agreed to make the payment on Lai's trust products if there are defaults," *id.* ¶ 54;

- And "former employees" in Fanhua's "finance divisions" told JCap that "Fanhua backed and paid for two defaults by Lai's entities," *id.* ¶ 55.

These allegations bear none of the indicia of reliability that have led courts applying *Novak* to sustain allegations as sufficiently particular.

First, the FAC does not contain any "independent [well-pled] factual allegations" that "corroborate [the] confidential source[s's] statements." *Glaser*, 772 F. Supp. 2d at 590.

Second, the witnesses' positions and job responsibilities are not described at a sufficient level of particularity to "indicate a high likelihood that they actually knew facts underlying their allegations." *Id.* The JCap Report cites four "longtime" employees, one of whom worked in a financial role, "several interviewees," and "former employees" in "finance divisions," without any description of these employees' roles or titles. Fanhua, however, is a financial services provider. Describing an employee in a "financial role" therefore does not provides sufficiently particular information about that person's job and responsibilities. The "sales agent" and the manager at Puyi Wealth Management present closer questions, but these descriptions, too, suffer from a failure to specify the anonymous interviewees' roles, the sources of their knowledge (including how non-employees of Fanhua came to learn of the alleged guarantees), and, in the case of the sales agent, the witness's employer. *See, e.g., id.* at 594–95; *In re Sierra Wireless*, 482 F. Supp. 2d at 376; *In re CMGE*, 2016 WL 922711, at *4.

Third, the anonymous interviewees' statements are, aside from the JCap Report's use of the present tense, entirely unmoored in time. The failure to anchor the witness statements in the Class Period is particularly problematic for both the Puyi Wealth manager's purported statement that Fanhua agreed to make the payment on Lai's trust products in the event of are defaults and the former finance division employees' purported statements that Fanhua had backed and paid for two defaults by Lai's entities. In particular, the FAC is silent as to any basis to believe either that these witnesses have knowledge as to Fanhua's current operations or that their statements about past practices apply to the present as opposed to just the period before Lai's resignation. *See, e.g., ProNAi Therapeutics*, 297 F. Supp. 3d at 409; *In re Lululemon*, 14 F. Supp. 3d at 580; *In re CMGE*, 2016 WL 922711, at *4; *In re Lehman Bros.*, 2013 WL 3989066, at *4.

Fourth, the content of the financial-guarantee allegations contained in the JCap Report is insufficiently particular. None of JCap's sources describe which of Lai's investment products the alleged guarantees cover. The FAC contains a conclusory allegation that the financial guarantees are for between 6.5% and 8.5% of principal and returns. But it does not supply any detail as to the who, what, when, where, and how of the operation of the guarantees. Such general allegations from an anonymous source do not suffice. *See, e.g.*, *Schiro*, 396 F. Supp. 3d at 305–06; *In re Lululemon*, 14 F. Supp. 3d at 581; *In re Sierra Wireless*, 482 F. Supp. 2d at 376; *Lopez*, 173 F. Supp. 3d at 32 n.8.[23]

Fifth, plaintiff's counsel in this case appear to have done nothing whatsoever to confirm the identities or statements of the confidential sources cited in the JCap Report. As the district court noted in *In re Lehman Brothers*: "Allowing counsel to rely on confidential witness statements recounted" in a separate document whose authors had "significant motive and opportunity . . . to misuse or mischaracterize confidential witness statements . . . would provide the Court little assurance that the factual contentions have any evidentiary support." *In re Lehman Bros.*, 2013 WL 3989066, at *4. Such allegations—where neither investigated nor corroborated—sit, at best, uneasily with the requirements of Rule 11. *See id.*; *In re Millennial Media*, 2015 WL 3443918, at *11. There is no indication that plaintiff's counsel here tried to locate or contact a single one of the sources on which they rely, or otherwise to corroborate these secondhand accounts.

Significant, too, as noted above with regard to the alleged related-party transactions, the same JCap Report contained significant factual errors. An alert reader of Fanhua's 2017 Form

---

[23] The FAC's allegation that Fanhua "backed and paid for two defaults by Lai's entities," FAC ¶ 55, might contain sufficiently specific content, but it must be disregarded because it is both unsourced and completely unsituated in time.

20-F would have caught these. Yet Miao, far from catching them, reproduced these incorrect facts in the FAC. *See Harris*, 135 F. Supp. 3d at 159 (noting plaintiff's concession that short-seller report on which its complaint had relied was "wrong in certain respects and . . . proven wrong in others by the passage of time"). Miao's failure to recognize and engage with the dubious reliability of the short-seller reports is concerning. It suggests the lack of the reasonable inquiry required on plaintiff's counsel's part before signing and certifying a complaint. *See* Fed. R. Civ. P. 11. And it necessarily raises doubt as to whether the other factual representations in the same short-seller's report on which the complaint relies can be credited as a reliable basis to establish the factual falsity of Fanhua's representations to the market.

When properly utilized and suitably corroborated or particularized, factual representations by CWs and in short-seller reports may enable a securities fraud complaint to clear the bar set by the PSLRA. *See, e.g.*, *Ho*, 887 F. Supp. 2d at 564; *In re Longwei Petroleum*, 2014 WL 285103, at *3–4; *SkyPeople Fruit Juice*, 2012 WL 3957916, at *14. Not so here. Miao's FAC instead relies exclusively on general statements credited to anonymous interviewees in a secondhand short-seller report which contains demonstrable errors and is uncorroborated by an independent investigation by counsel, if one indeed one was even undertaken. The Court accordingly holds that the FAC fails to plead an actionable misstatement or omission as to related-party guarantees, and therefore fails to do so with respect to any of the categories of subjects on which it relies.

## 2. Failure to Otherwise Plead Scienter

Separately, the FAC fails adequately to plead scienter.

To survive a motion to dismiss, Miao must "state with particularity facts giving rise to a strong inference" of scienter. 15 U.S.C. § 78u–4(b)(2). As noted, "for an inference of scienter to be strong," it must be "at least as compelling as any opposing inference one could draw from the

facts alleged.'" *ATSI Commc'ns*, 493 F.3d at 99 (alteration and emphasis in original) (quoting *Tellabs*, 551 U.S. at 324).  In order to satisfy this requirement Miao must allege facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."  *Id.*

*a.*     *Motive and Opportunity*

The FAC entirely fails to plead that Fanhua or the Officer Defendants had motive to commit fraud with respect to the alleged financial guarantees (or any other category of allegedly actionable misstatement).  Pleadings "must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter."  *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).  Miao's defense of the FAC's pleading as to scienter relies only on "Lai's glaring motive to commit this fraud."  Pl. Mem. at 19.  But the FAC does not name Lai as a § 10(b) or Rule 10b-5 defendant. *See* FAC ¶¶ 27, 94–105.

Moreover—although Lai remained a large, though not controlling,[24] shareholder after his resignation from his executive and board roles with the company—the FAC does not supply any basis on which to impute Lai's motive to the company or the Officer Defendants.  In contrast, the cases on which Miao relies all involved current senior management and/or board members whose state of mind could easily be imputed to their companies.  *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 178 (2d Cir. 2015) ("high-level" employees); *Dynex Capital Inc.*, 531 F.3d at 195 (officers); *Rex & Roberta Ling Living Tr. u/a Dec. 6, 1990*

---

[24] *See, e.g.*, *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 740–41 (S.D.N.Y. 2015) (25% stock ownership and right to appoint a quarter of the board insufficient for control); *In re China Valves Tech. Sec. Litig.*, 979 F. Supp. 2d 395, 414 (S.D.N.Y. 2013) (34% ownership insufficient for control); *In re Deutsche Telekom AG Sec. Litig.*, No. 00 Civ. 9475 (SHS), 2002 WL 244597, at *6 (S.D.N.Y. Feb. 20, 2002) (22% ownership, without more, insufficient for control).

*v. B Commc'ns Ltd.*, 346 F. Supp. 3d 389, 396 (S.D.N.Y. 2018) (chairman of the company); *Braskem*, 246 F. Supp. 3d at 765 n.14 (executives and current employees); *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 307 (S.D.N.Y. 2013) (senior management). Lai, by contrast, retired from all of his official roles at Fanhua more than two years before the start of the Class Period.  Miao thus has failed to allege that any of the § 10(b) defendants "benefitted in some concrete and personal way from the purported fraud," *ECA*, 553 F.3d at 198, and has failed demonstrate any motive to commit fraud on their part.

### b.  *Conscious Misbehavior and Recklessness*

Because Miao has failed to establish motive, he bears a "correspondingly greater" burden in alleging conscious misbehavior or recklessness.  *Kalnit*, 264 F.3d at 142 (internal quotation marks omitted).  As noted, to survive dismissal, the complaint must plead behavior which is "highly unreasonable" and "an extreme departure from the standards of ordinary care."  *Novak*, 216 F.3d at 308 (internal quotation marks and citation omitted).  In other words, the pled facts must indicate "a state of mind approximating actual intent, and not merely a heightened form of negligence."  *Id.* at 312 (internal quotation marks omitted).  The FAC falls well short of this standard.

Viewed in the light most favorable to the plaintiff, the FAC's allegations of recklessness as to the financial guarantees consist of: (i) a conclusory statement that the Officer Defendants must have been aware of any material financial transactions with Lai, including financial guarantees, FAC ¶ 83; (ii) an allegation that, by virtue of their positions at Fanhua and past experience with Lai, the Officer Defendants must have been reckless as to the existence of such guarantees, *see id.* ¶¶ 84, 98–99; (iii) an allegation that the Officer Defendants signed and provided Sarbanes-Oxley certifications for the 2017 Form 20-F, *id.* ¶ 63; and (iv) an allegation

that, on February 13, 2019, Fanhua's board formed an independent special committee to conduct an independent review of the allegations at issue in this litigation, *id.* ¶ 80. Miao argues that these allegations give rise to a strong inference of scienter. Miao's arguments are mistaken.

Miao first alleges that "[d]efendants Wang and Ge were aware of or, at the least, recklessly disregarded that these material financial transactions were being executed with Lai." *Id.* ¶ 83; *see* Pl. Mem. at 20. However, beyond this conclusory assertion, Miao does not allege any facts to suggest that Wang or Ge knew of the alleged financial guarantees. Notably, the FAC, while alleging that "Defendants made statements to investors throughout the Class Period specifically concerning the transactions-at-issue, such as the [alleged related-party dispositions] and the [521 Development Plan]," does not so allege as to the purported financial guarantees. FAC ¶ 83. Nor does the FAC allege facts circumstantially suggesting such knowledge. Absent concrete allegations as to the Officer Defendants' knowledge of the alleged financial guarantees, the FAC cannot generate a strong inference of scienter. *See In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 765 (S.D.N.Y. 2018).

Next, Miao alleges that the Officer Defendants "were privy to confidential proprietary information" and "had knowledge of the details of Fanhua's internal affairs" because of their senior positions at Fanhua. FAC ¶¶ 98–99; *see* Pl. Mem. at 20 (noting relevance of "high-level positions"). But "it is practically hornbook law that 'accusations' such as these, which are 'founded on nothing more than a defendant's corporate position[,] are entitled to no weight." *In re Rockwell Med., Inc. Sec. Litig.*, No. 16 Civ. 1691 (RJS), 2018 WL 1725553, at *14 (S.D.N.Y. Mar. 30, 2018) (collecting cases); *see In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 406 (S.D.N.Y. 2006) (allegations "that the individual [d]efendants knew, or

should have known, that they were misrepresenting material facts, based on their senior positions in the company," are "insufficient, as a matter of law, to establish scienter" (citations omitted)).

The cases on which Miao relies are not to the contrary. *See Christine Asia Co. v. Ma*, 718 F. App'x 20, 23 (2d Cir. 2017) (scienter adequately pled as to failure to disclose secret meeting at which Chinese regulator threatened company in advance of company's initial public offering, based on "the high-level nature of the meeting, the seniority of the attendees, its conduct in secret, and the huge potential impact of the [regulator's] threat made at the meeting on [the company] and its imminent IPO," as opposed to the mere fact of defendants' high-level positions); *In re Mylan N.V. Sec. Litig.*, No. 16 Civ. 7926 (JPO), 2018 WL 1595985, at *13 (S.D.N.Y. Mar. 28, 2018) (setting forth array of well-pled facts supporting scienter and identifying as "most important" that "[the pharmaceutical company's regulator] repeatedly informed [the company] that [the company] was misclassifying [one of its key products] for purposes of the [Medicaid Drug Rebate Program]"); *Gruber v. Gilbertson*, No. 16 Civ. 9727 (WHP), 2018 WL 1418188, at *1, *12 (S.D.N.Y. Mar. 20, 2018) (officer and director defendants acted with reckless disregard of obvious duty to disclose illegal activity where internal investigation had already revealed stock manipulation scheme involving company insider who had concealed his beneficial ownership in the company, and "instead of disclosing the misconduct, the officers and directors approved attractive compensation packages for each other, and continued to publicly vouch for the [c]ompany's financial condition"); *In re Advanced Battery Techs., Inc. Sec. Litig.*, No. 11 Civ. 2279 (CM), 2012 WL 3758085, at *10–11 (S.D.N.Y. Aug. 29, 2012) (where well-pled facts alleged that defendant "reported financial results to the Chinese regulator that were a fraction of those reported to the SEC" and used money thereafter raised from U.S. shareholders "to fund undisclosed related party transactions

between [the company] and its Chairman and CEO," the inference of scienter was "inescapable"). These cases stand for the unremarkable proposition that, where a complaint's well-pled facts allege false statements regarding activity—*e.g.*, a significant threat from a key government regulator—that would invariably be brought to the attention of senior executives, a defendant's high position may bolster an already-significant inference of scienter. No such circumstances are alleged here.

The FAC similarly alleges that the "memory of a recent alleged fraud . . . should be fresh in the minds of" Lai and Ge, who, as noted, had been defendants in a 2011 securities lawsuit. FAC ¶ 84 (citing *CNinsure*, 951 F. Supp. 2d at 479). Although this history is cognizable, because the Court must consider "*all* of the facts alleged, taken collectively," *Tellabs*, 551 U.S. at 323 (emphasis in original), it does not constitute a particular allegation that the Officer Defendants, or any executive whose state of mind could be imputed to Fanhua, were aware of the specific alleged financial guarantees at issue here.[25]

Third, Miao argues that the Officer Defendants' signatures and certifications, pursuant to §§ 302 and 906 of the Sarbanes-Oxley Act of 2002, on the 2017 Form 20-F, support scienter. Pl. Mem. at 21; *see* FAC ¶ 63. However, a plaintiff "cannot raise an inference of fraudulent intent based on the signing of a certification without alleging any facts to show a concomitant awareness of or recklessness to the materially misleading nature of the statements." *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 615 (S.D.N.Y. 2015) (collecting cases); *see Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 816 (S.D.N.Y. 2018). The FAC does not allege specific contrary information known to Wang or Ge at the time they signed

---

[25] Notably, in his opposition brief, Miao does not pursue this argument relating to the prior lawsuit.

and certified the 2017 Form 20-F containing the allegedly false statement regarding financial guarantees. And where a plaintiff "does not adequately allege that [defendants] had actual knowledge" of the alleged activity underlying the allegations of fraud, "it undermines the allegations that they knew that the S[arbanes]-O[xley] certifications were false." *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 517 (S.D.N.Y. 2017). The Sarbanes-Oxley certifications and signatures thus do not support an inference of scienter here.

Fourth, and finally, Miao argues that Fanhua's undertaking an independent investigation supports scienter. It is unclear why a company's initiation of an independent investigation—after not only the alleged misstatements but also the end of the Class Period—has any bearing on defendants' state of mind at the time of the alleged misstatements. The one case Miao relies on is inapposite, as the court there found that top executives' "reject[ing] calls for a legitimate independent investigation and effectively shut[ting] down the investigation" contributed to a finding of scienter. *City of Pontiac Gen. Emps.' Ret. Sys. v. Wal-Mart Stores, Inc.*, No. 12 Civ. 5162 (SOH), 2014 WL 4823876, at *10 (W.D. Ark. Sept. 26, 2014). In other words, the later obstruction or termination of an independent investigation, as opposed to the initiation of such, may support inferring scienter. Fanhua's initiation of an independent investigation here, if anything, supports the opposite inference. *See, e.g.*, *Slayton v. Am. Express Co.*, 604 F.3d 758, 777 (2d Cir. 2010) ("Ordering an investigation . . . was a prudent course of action that weakens rather than strengthens an inference of scienter." (internal quotation marks and citations omitted)).

Considering "*all* of the facts alleged, taken collectively," the FAC does not "give rise to a strong inference" that defendants were reckless as to the purported existence of the alleged financial guarantees. *Tellabs*, 551 U.S. at 323. Put differently, Miao has alleged a few facts that

would be the proverbial "cherry-on-top" had there been an adequate pleading of scienter, but he has failed to allege the sundae. The Officer Defendants' senior positions and history with Lai could enhance a showing of scienter. But, without significantly more, they do not give rise to a *strong* inference of scienter.

Accordingly, even if the allegations in the JCap Report were sufficiently particular to allege knowing falsity—and they are not—Miao's financial guarantee allegations would still fail to state a § 10(b) or Rule 10b-5 claim due to a failure to plead scienter.[26]

### D.    Section 20(a) Claims

Miao brings claims against the Individual Defendants under § 20(a) of the Exchange Act. FAC ¶¶ 107–12. To state a claim under § 20(a), a plaintiff must adequately allege "a primary violation by the controlled person." *Carpenters Pension Tr. Fund*, 750 F.3d at 236 (quoting *ATSI Commc'ns*, 493 F.3d at 108). Because Miao has not done so, his § 20(a) claims must also be dismissed. *See, e.g.*, *In re Lions Gate Entm't Corp. Sec. Litig.*, No. 14 Civ. 5197 (JGK), 2016 WL 297722, at *18 (S.D.N.Y. Jan. 22, 2016) (dismissing § 20(a) claim based on failure to adequately allege a primary violation).

### E.    Leave to Replead

Miao seeks, in the alternative, leave to file an amended complaint pursuant to Federal Rule of Civil Procedure 15(a). Pl. Mem. at 25.

Where the problems with a claim are "substantive" rather than the result of an "inadequately or inartfully pleaded" complaint, an opportunity to replead would be "futile" and "should be denied." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citing *Hunt v. Alliance N. Am. Gov't Income Tr.*, 159 F.3d 723, 728 (2d Cir. 1998)). Here, for the reasons

---

[26] Because the Court has found all three sets of Miao's § 10(b) allegations insufficient, the Court does not have occasion to reach defendants' alternative arguments relating to loss causation.

noted, the deficiencies of Miao's related-party transaction and 521 Development Plan claims are substantive. The Court therefore denies leave to replead on the grounds that any amendment would be futile.

However, the Court grants leave for Miao to amend his claim relating to financial guarantees. As of the date of his opposition to the motion to dismiss, Miao's counsel appears not to have done any independent investigation of these matters, having chosen to piggyback instead on the JCap Report. In theory, an independent investigation could substantiate Miao's theory that such an actionable fraud occurred, accompanied by scienter. Assuming a dramatically fortified amended complaint, Miao conceivably might cure "the deficiencies addressed by the court and allege facts sufficient to support the claim." *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 347 F. App'x 617, 622 (2d Cir. 2009). The Court will give Miao a brief window in which to try.

## CONCLUSION

For the foregoing reasons, the Court dismisses the FAC in its entirety. The dismissal is with prejudice to all claims save Miao's claims with respect to financial guarantees. Any amended complaint as to this subject is due Thursday, March 20, 2020. Should Miao fail to submit an amended complaint by that date, the Court's dismissal of his claims regarding financial guarantees will also be with prejudice.

The Clerk of Court is respectfully directed to terminate the motions pending at dockets 33 and 48.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: March 2, 2020
       New York, New York